LUBBOCK COUNTY, Texas, Appellant,

v.

Karen K. STRUBE, Appellee.

No. 03–96–00510–CV.

Court of Appeals of Texas, Austin.

Sept. 25, 1997.

Ann Clarke Snell, Valerie P. Kirk, Bickerstaff, Heath, Smiley, Pollan, Kever & McDaniel, L.L.P., Austin, for Appellant.

Donald M. Hunt, Carr, Fouts, Hunt & Wolfe, L.L.P., Lubbock, for Appellee.

Before B.A. SMITH, ABOUSSIE and KIDD, JJ.

## ON MOTION FOR REHEARING

BEA ANN SMITH, Justice.

To address certain concerns raised in the motions for rehearing, we withdraw our opinion and judgment of August 14, 1997, and substitute the following in its place.

Karen Strube sued Lubbock County, her employer, alleging retaliatory discrimination and retaliatory termination in violation of the Whistleblower Act.[1] The trial court rendered judgment on a jury verdict, awarding Strube $630,000 in actual damages, $1,250,000 in exemplary damages, and 40% of total damages as reasonable attorneys' fees. The County appeals. We will reverse and render the judgment in part, remand a portion for further proceedings, and affirm the remainder of the trial court's judgment.

## PROCEDURAL BACKGROUND

In 1994, Strube sued Lubbock County contending she was wrongfully suspended for ten days without pay and wrongfully placed on probation for a year. The sheriff's department said she was disciplined for engaging in horseplay with other employees; Strube alleges the discipline was in fact retaliation for her report to the Texas Department of Health that the sheriff's department improperly used certain chemical cleaners. There were several other incidents, and the sheriff's department terminated Strube's employment in 1995. After exhausting her administrative remedies, Strube brought this Whistleblower cause of action. The jury found that: (1) the County retaliated against Strube for reporting conditions she believed to be violations of law to the Texas Depart-

---

1. Because the 1995 amendments govern only conduct occurring after June 15, 1995, the 1993 version of the Whistleblower Act applies in this case. See Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 609–11, amended by Act of May 25, 1995, 74th Leg., R.S., ch. 721, 1995 Tex. Gen. Laws 3812, 3814.

ment of Health; (2) she suffered damages of $20,000 for lost wages, $260,000 for loss of future earning capacity, $300,000 for past mental anguish, and $50,000 for future mental anguish; (3) the County acted with malice in its retaliation; and (4) Strube's reasonable attorneys' fees, stated as a percentage of damages, were 40%. In a bifurcated proceeding, based upon the finding of retaliation with malice, the jury also determined that the County was liable for exemplary damages in the amount of $1,250,000. The trial court rendered judgment on the jury verdict in favor of Strube.

In five points of error, the County challenges the legal and factual sufficiency of the evidence supporting the jury findings of retaliation, future mental anguish, attorneys' fees, and malice, and contends the trial court erred by allowing Strube's expert on loss of future earning capacity to testify contrary to his report submitted during discovery.

## FACTUAL BACKGROUND

In 1988, Strube began her employment as a Lubbock County jailer serving under Sheriff Sonny Keesee. Strube completed a two-week course at jail school and a two-week training period before becoming an officer. Generally, she worked the night shift.

### The cleaning assignment

In February 1994, Lieutenant Dumas gave Strube a cleaning assignment that required her to use some new cleaning products that were highly corrosive. The County provided no training or safety equipment to protect against the dangerous chemicals. When Strube applied the cleaners to a day-room table, white fumes filled the room, causing her respiratory problems and making her eyes water. Additionally, Strube noticed a burning sensation on her hands, legs, and feet, all areas directly exposed to the cleaners. Later blisters appeared on Strube's face, hands, and feet.

### Strube complains

When Strube reported to work for her next shift, she showed the blisters to her immediate supervisor, Sergeant Gentry, who dismissed her complaint, saying she was always fussing about something. Next Strube complained about the cleaning products to Lieutenant Dumas, who responded, "[W]hatever the front office wants is what we're going to do. So quit your bitching and just go back to work." Neither Sergeant Gentry nor Lieutenant Dumas suggested that Strube report her injuries.

### Strube's report

When her supervisors dismissed her complaints, Strube took matters into her own hands; she retrieved the empty containers from the trash. The labels warned that the cleaners were extremely corrosive and should only be used with protective equipment. To document her concerns, Strube removed the warning, "because they're making us use this stuff without telling us about the dangers that are involved with it or providing us with any protective gear." On her way home, Strube stopped at her father's house and showed him her blisters and the warning. Her father called the Texas Department of Health, the state agency responsible for enforcing the Texas Hazard Communications Act. See Tex. Health & Safety Code Ann. §§ 502.001, .012 (West 1992).

Strube discussed her use of the cleaning products with Perry Williams, an inspector at the Department of Health. Williams told Strube that he would investigate the County's use of the cleaners and assured her the report would be confidential. A few days after Strube spoke with Williams, he met with the county judge and the sheriff and inspected the jail. On his inspection he found labeling violations that failed to notify the user of chemical hazards. The Department of Health proposed a fine unless the safety violations were corrected. Williams refused to disclose the name of the complainant.

Strube also told the union lawyer, Floyd Holder, about the blisters she received from the cleaning products. In a letter to the County, Holder identified Strube as his client and asked the County to provide its employees with protective gear. Don Addington, the jail administrator, commented, "I guess when all this is over that we're going to have to fire her." One of Strube's fellow officers thanked her for contacting the Department of Health. Strube was alarmed and said she

did not want anyone to know she made the report; the other officer said everyone already knew. Strube became more alarmed when Sheriff Keesee telephoned her at home to discuss the complaint to the Department of Health and to question her loyalty. When Strube asked if she would get in trouble for her actions, the sheriff assured her, "[t]here won't be any retaliation taken against you. Just next time come talk to me." The next night, Sergeant Gentry again relayed the sheriff's assurances that there would be no retaliation against her for the report. Strube testified that this merely raised her suspicions.

After the sheriff called Strube at home, Captain Holcomb asked her to complete an injury report. Both Strube and her fellow officers sensed that senior officials in the sheriff's department were upset with her. Lieutenant Dumas uncharacteristically refused to let Strube off work at 7:00 a.m. to pick up her son. When he finally let her off an hour late, Dumas said mysteriously, "Oh, well. Couldn't help it, could we?" Strube also noticed she was no longer given voluntary overtime opportunities. Strube recalled an incident when she asked Lieutenant Dumas to not schedule her for any overtime for the week of her son's birthday. Dumas told her he did not care, and put her name on the mandatory overtime list. He told her "maybe they won't want you." Dumas also did not allow her any time off when her daughter was hospitalized. When Strube suffered a shoulder injury her doctor prescribed only light duty work for four weeks. Nevertheless, Lieutenant Dumas assigned her to tasks that were not light duty. When she complained, Captain Holcomb rejected her appeal from Dumas's decision.

### The slapping incident

In May 1994, several officers were teasing Sergeant Yeates because he drew a "whiner" as his partner in the department's golf tournament. In jest, Strube and others dared Yeates to slap the partner if he started whining during the game. Yeates decided to feign a slap to the whiner but accidentally struck him on the face. The unintended victim reported the incident.

At the disciplinary proceeding against Yeates, Strube was called as a witness. At the hearing, Chief Bartley threatened to file criminal conspiracy charges against Strube. Chief Bartley also threatened to ruin Strube's career and family by making sure she went to prison if the slapped officer filed charges. Strube became very upset and told Chief Bartley she would accept any punishment because she did not want to go to prison. The disciplinary board suspended Strube for ten days and placed her on probation for one year; it also demoted Yeates, sanctioned him, and placed him on probation for one year. None of the other officers engaged in this incident were punished.

Strube complained to Sheriff Keesee about the suspension. He replied that "examples had to be set to show others that that kind of conduct would not be tolerated in his jail." He instructed her to conduct herself as a professional and to avoid embarrassing the department when she returned to work. As she was leaving his office, the sheriff gave Strube a pamphlet discussing inmates' privileges in Texas prisons and suggested that she think about the pamphlet while she was on suspension.

### Strube returns to work

When Strube returned to work, she was assigned for four months to a remote area of the jail to guard sex offenders, known to routinely taunt female jailers. Typically when a jailer reported such behavior, the inmates were disciplined; however, none of Strube's hecklers received any disciplinary action.

In July 1994, two months after the disciplinary hearing, Strube sued the County alleging that the slapping incident had been merely a pretext when in truth she had been disciplined in retaliation for her report to the Department of Health.

### Second disciplinary hearing

In January 1995, the department reduced Sergeant Yeates' probationary sentence to six months, resulting in early completion; Strube testified that her request for the same reduction was denied. A few weeks later, she received notice from Captain Metsgar of a disciplinary hearing scheduled for

February 17, 1995. The notice averred that Strube failed to obey orders, performed her work improperly and carelessly, and implied that she had violated department rules by filing a lawsuit against the County without first notifying Sheriff Keesee. The day before the scheduled hearing, Strube received a cancellation notice informing her that Sheriff Keesee had assigned Chief Bartley and Assistant Jail Administrator Gutierrez to further investigate her violations. This was contrary to department policy, which normally assigned such investigations to the shift captain of the accused.

Strube soon received a second notice of a disciplinary hearing from Bartley and Gutierrez. This notice generally alleged a violation concerning the movement of inmates. Strube's request for more information regarding the allegation was denied. Strube appeared at the disciplinary hearing before a board of seven officers of various ranks in the sheriff's department. The members of the board included Chief Bartley, Captain Metsgar, Lieutenant Gutierrez, Lieutenant Hobbs, Sergeant Marquez, Officer Smyer, and Officer Schulle. Strube learned that an inmate, who was a friend of the sheriff's, wrote a letter to the sheriff accusing Strube of providing her with unauthorized medications and failing to correctly type a poem. Chief Bartley conceded these allegations were not serious. After the inmate submitted the letter, the chief had Lieutenant Hobbs call the inmate in the middle of the night and videotape the accusations. During the late night video session, the inmate related another incident with Strube concerning the "chain" process of transferring inmates to state prison. It was departmental policy to keep inmate movement secret to protect officers and inmates from potential violence. On February 7, the inmate suspected that a "chain" was going out and repeatedly asked Strube if she was going on the chain. The inmate's version was that Strube told her that she was on the chain. Strube's version was that after repeated badgering, she answered, "If you think you're on the chain, pack your bags because I don't care if you're on the chain or not." Although the County contends that the inmate's version was corroborated at the disciplinary hearing, this "corroborating officer's" deposition at trial showed that she never heard Strube tell the inmate she was on the chain. Evidence showed that, without being charged with a breach of security, officers routinely told inmates to pack their bags if they thought they were on the next chain. When the board considered punishment, the chief immediately asked the members to vote to terminate Strube's employment. The board at first divided on termination but ultimately voted six to one to terminate Strube's employment.[2]

## DISCUSSION

### *Jury's Finding of Retaliation*

By point of error one, the County contends the evidence is legally and factually insufficient to support the jury's finding that the County retaliated against Strube because of her report to the Department of Health.

The Whistleblower Act provides for the recovery of damages and other relief when a governmental entity discriminates against a public employee who in good faith reports a violation of law to an appropriate law enforcement authority. Tex. Gov't Code Ann. §§ 554.002, .003 (West 1994). A causal link between the report and the employer's prohibited conduct is presumed if the employer's action occurs within 90 days of the employee's report. *Id.* § 554.004. If the employer's action occurs later than this, the employee must prove a causal link but does not have to prove that reporting the illegal conduct was the *sole* reason for the employer's adverse action. *Texas Dep't Of Human Servs. v. Hinds,* 904 S.W.2d 629, 634 (Tex. 1995). "[T]he employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did. *Id.* at 633; *Texas Natural Resource Conserv. Comm'n v. McDill,* 914 S.W.2d 718, 722 (Tex.App.—Austin 1996, no writ). The *Hinds* causation test has been

---

2. The County points out that in 1989, Strube was referred to a disciplinary board following reports she informed an inmate that a "chain was going out" and failed to give an inmate medication as logged. That board recommended no disciplinary action at that time.

described as a "but for" causal nexus requirement. *McDill,* 914 S.W.2d at 723.

The jury was asked "[D]id Lubbock County retaliate against Karen Strube for reporting to the Texas Department of Health conditions that she in good faith believed were violations of the law?" The court instructed the jury that "retaliation" includes discrimination or termination of employment and "good faith" means (a) "that Karen Strube believed the conditions she reported were a violation of law and (b) that her belief was reasonable in light of her training and experience." The County did not object to this submission.

When deciding a legal-sufficiency point, the appellate court considers only the evidence and inferences tending to support the jury findings, disregards all evidence and inferences to the contrary, and reverses only if no evidence supports the findings. *Alm v. Aluminum Co. of Amer.,* 717 S.W.2d 588, 593 (Tex.1986); *Wichita County v. Hart,* 892 S.W.2d 912, 923 (Tex.App.—Austin 1994), *rev'd on other grounds,* 917 S.W.2d 779 (Tex. 1996). When deciding a factual-sufficiency point, the appellate court considers all of the evidence and sets aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Hart,* 892 S.W.2d at 923. The jury's finding must be upheld unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). We are not free to substitute our judgment for the jury's simply because we may disagree with the verdict. *Herbert v. Herbert,* 754 S.W.2d 141, 142 (Tex.1988).

Often in employment discrimination cases, there is no direct evidence. *Castaneda v. Texas Dep't of Agriculture,* 831 S.W.2d 501, 505 (Tex.App.—Corpus Christi 1992, writ denied). Indeed, a series of acts by an employer can sufficiently raise inferences to overcome legal and factual sufficiency challenges. *Texas Dep't of Human Servs. v. Green,* 855 S.W.2d 136, 146 (Tex.App.—Austin 1993, writ denied). Additionally, a jury is free to believe or disbelieve any part of the evidence in making its finding. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986); *Hart,* 892 S.W.2d at 926.

We hold the evidence is both legally and factually sufficient to support the jury's finding that the retaliation would not have occurred but for Strube's report to the Department of Health. Almost immediately after the report, Strube's supervisors began treating her negatively. There was testimony that the jail administrator said the department was going to fire Strube "when this is all over." The sheriff called Strube at home and questioned her loyalty. Before her report, Strube was scheduled for voluntary overtime; after the report she was denied any voluntary overtime. Strube was assigned to the sex offender unit for several months and her complaints about the inmates' actions went unanswered. Her supervisors denied her scheduling relief when her child was hospitalized following an emergency.

A theme running through appellant's brief is that an impartial disciplinary board voted to terminate Strube's employment, not the department's administration. The County argues that the board never considered her report to the Department of Health or her lawsuit filed against the County for retaliation. Consequently, the County is not liable because the sheriff's department administration took no retaliatory acts against Strube.

It is the jury's responsibility to determine the credibility of the witnesses, choose which portions of testimony to believe or disbelieve, and weigh the evidence. While Strube's disciplinary board was comprised of seven department employees, the members included Chief Bartley, Captain Metsgar, and Lieutenant Gutierrez, all of whom were involved directly with incidents that the jury could have viewed as retaliatory, incidents occurring immediately following Strube's report to the Department of Health. The jury could have noted that because Chief Bartley immediately asked the board to terminate Strube's employment, the board was unduly influenced in reaching its decision to terminate her employment.

We conclude that there is some evidence to support the jury's finding and that the finding is not so against the great weight and preponderance of the evidence as to be unjust. We overrule point of error one.

### Expert Testimony on Loss of Earning Capacity

In point of error two, the County contends the trial court erred by allowing Strube's accounting expert, Jonathan Kemmerer, to testify differently from his report produced during discovery regarding Strube's loss of future earning capacity. The County argues the trial court should have excluded Kemmerer's testimony to the extent it differed from the report. Tex.R. Civ. P. 166b(6)(a), (b) & 215(5); *see Mentis v. Barnard*, 870 S.W.2d 14, 16 (Tex.1994); *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 915 (Tex.1992).

In his report furnished during discovery, Kemmerer stated that he used the "human capital" or "lost economic output" approach for calculating Strube's future losses due to diminished earning capacity. This method takes the plaintiff's annual salary at the lost job and deducts a percentage based on the amount of diminished earning capacity found by the jury. The loss is calculated over the number of future years the plaintiff is expected to work; the figures for future years are increased to account for inflation and reduced by a "discount factor" to account for the present value of money.

Kemmerer's pretrial report estimated losses of $21,473 if the jury found Strube suffered a ten percent loss in earning capacity and $53,683 for a twenty-five percent loss. The figures were based on ten years of future employment and a discount factor of seven percent. On the morning of trial, Strube's attorney furnished the County's attorney with a new report from which Kemmerer testified at trial. At trial Kemmerer gave figures of $258,704 and $517,407 for fifty percent and one hundred percent losses, respectively. These figures were based on twenty-five years of future employment and a five percent discount factor.

After Kemmerer's direct examination, the County objected to the testimony on the ground that it had not received the new report at least thirty days prior to trial and that Kemmerer's testimony reflected significant changes in the basic assumptions of his methodology. The County referred to an objection made at the bench when it received the new report, but that objection is not on the record as required by Texas Rule of Evidence 103. The County never moved to strike Kemmerer's testimony. The County did not timely object to Kemmerer's testimony and thus waived any complaint on appeal. *See* Tex.R.App. P. 33.1(a) (former Tex.R.App. P. 52(a)); Tex.R. Civ. Evid. 103(a).

Even if the County had timely objected, we would conclude that the trial court properly admitted the testimony. Admitting and excluding evidence are matters within the trial court's discretion. *Green*, 855 S.W.2d at 149; *Tracy v. Annie's Attic, Inc.*, 840 S.W.2d 527, 531 (Tex.App.—Tyler 1992, writ denied). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause rendition of an improper judgment. *Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 303 (Tex. 1993); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989); Tex.R.App. P. 44.1(a) (former Tex.R.App. P. 81(b)(1)).

Although the County's objection was late, the trial court dismissed the jury and held a hearing on whether to admit the testimony. The trial court determined there was no difference in the *methodology* Kemmerer used to reach the pretrial numbers and the numbers given at trial. In *Exxon Corp.*, 868 S.W.2d at 304, the supreme court affirmed the trial court's admission of expert testimony where the proponent presented new calculations to the opposing party five days before trial, because the method used would lead to substantially the same results as the method presented during discovery. In this case, Kemmerer used the same formula but provided figures based on jury findings of fifty and one hundred percent diminished earning capacity. Kemmerer told the trial court that he did not provide figures earlier at these levels because Strube's attorney only requested those scenarios the day be-

fore. Kemmerer told the jury that a reasonable range for the discount factor was from four to nine percent, and that he chose to use five percent because he considered it to be a conservative, reasonable amount. Although the pretrial report calculated losses based on only ten years of future employment, the County could have anticipated that Kemmerer would use a more realistic number for a thirty-five-year-old woman. The rules of discovery do not prevent experts from refining calculations and perfecting reports through the time of trial. *Exxon Corp.*, 868 S.W.2d at 304. Kemmerer did not make the kinds of fundamental alterations that would constitute a surprise attack on the opposing side. *See id.* at 305. The report furnished during discovery provided the County with his methodology and hypothetical calculations such that the County could prepare to attack his testimony on cross examination whatever the level of diminished earning capacity. We conclude the trial court did not abuse its discretion by admitting Kemmerer's testimony.

Under the same point of error, the County contends that even if Kemmerer's testimony was properly admitted, the evidence is legally and factually insufficient to support the finding of reduced future earning capacity. Kemmerer did not testify that impairment of earning capacity actually existed. Rather, he only estimated Strube's lifetime wages at various levels of impairment, should impairment exist. The County contends the jury was left to impermissibly speculate about Strube's loss of future earning capacity. *See Bonney v. San Antonio Transit Co.*, 160 Tex. 11, 325 S.W.2d 117, 121 (1959). The jury apparently concluded that Strube's earning capacity was diminished by fifty percent because it awarded Strube $260,000 for loss of future wages.

The Whistleblower statute does not specify the measure of damages for future losses. Tex. Gov't Code Ann. § 554.003 (West 1994); *Hart*, 892 S.W.2d at 924. While loss of future earning capacity is not the only measure, it is a measure recognized in a variety of cases. *Id.; City of Ingleside v. Kneuper*, 768 S.W.2d 451, 454 (Tex.App.—Austin 1989, writ denied). Additionally,

proof of lost wages is evidence of loss of future earning capacity. *Hart*, 892 S.W.2d at 925 n. 14.

At trial, Strube offered evidence of the wages she previously earned as compared to her current wages. As an officer with the sheriff's department, she made $26,000 per year plus benefits. As a nurse's aide, her salary dropped to $12,000 per year without benefits, a somewhat greater than fifty percent loss in earning capacity. The County asserts that Strube's expert testified that she was making almost as much per week in her new job as she had at the County. However, the record reflects her expert testified that "if" she made $500 per week in her new job she would be taking home as much as she had at the County less the benefits. According to Strube's testimony, during the six months at her new job, she earned $500 for only one week. Her total earnings at her new job were between $5000 and $6000.

Her termination from the sheriff's department could be seen as ending Strube's law enforcement career at the higher salary level. The evidence provided a basis on which the jury could infer a level of diminished earning capacity. We conclude the jury's finding is not so against the great weight and preponderance of the evidence as to render the judgment unjust. We overrule point of error two.

### Future Mental Anguish

By point of error three, the County contends the evidence is legally and factually insufficient to support the jury's finding that Strube will suffer future mental anguish damages in the sum of $50,000. The County does not challenge the jury's finding that Strube suffered past mental anguish damages in the sum of $300,000. The jury was instructed that

"mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, and/or public humiliation.

Damages for future mental anguish are recoverable "if there is a reasonable probability that they will be suffered in the future." *Hicks v. Ricardo,* 834 S.W.2d 587, 590 (Tex.App.—Houston [1st Dist.] 1992, no writ). Mental anguish damages may not be awarded without either "direct evidence of the nature, duration, or severity of [plaintiff's] anguish, thus establishing a substantial disruption in the plaintiff's daily routine," or other evidence of " 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.' " *Saenz v. Fidelity & Guar. Ins.,* 925 S.W.2d 607, 614 (Tex.1996) (quoting *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex. 1995)).

The only evidence in the record concerning future mental anguish was Strube's statement that after she was fired she became depressed and withdrew "into a shell." She stated that her depression lasted approximately four months. She then explained that "with the help of my family and my friends, I just realized that being fired from the sheriff's department wasn't the end of the world." The County contends the jury disregarded this testimony in finding that she should be compensated for continuing mental anguish.

Strube responds the evidence shows a reasonable probability that her past mental anguish will continue because her career loss continues in the future. Additionally, Strube argues the evidence supporting the unchallenged jury finding of $300,000 for past mental anguish logically permits the inference that the mental anguish will continue.

The record lacks any direct evidence that Strube's mental anguish will continue in the future. In fact, her testimony reflects just the opposite—although for four months she experienced much mental anguish, with the help of family and friends she realized that being fired was not the end of her life. We have searched the record and found no evidence that Strube would continue to suffer mental anguish in the future. We accordingly sustain the County's third point of error, reverse the trial court's award of future mental anguish damages in the sum of $50,000,

and render judgment that Strube take nothing in that regard.

### Attorneys' Fees

By point of error four, the County contends the award of attorneys' fees as 40% of Strube's total damages is not supported by the evidence. Strube was awarded $752,000 in attorneys' fees based on this percentage.

Broadus Spivey testified as an expert for Strube on attorneys' fees. In his opinion, a 40% contingency fee was reasonable for this case. Spivey stated on cross-examination that it would be inappropriate to "stack" attorneys' fees on top of the damages. The County seizes upon this statement as evidence that the attorneys' fees here should be deducted from Strube's damages recovery, not stacked on top of it. We note that the expert's opinion testimony was not probative of the pure question of law: whether an award of attorneys' fees should be added to or deducted from the plaintiff's recovery. *See Lyondell Petrochemical Co. v. Fluor Daniel, Inc.,* 888 S.W.2d 547, 554 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

While a contingency fee may be deducted from the recovery absent statutory award of attorneys' fees, such is not the case under this act. The Whistleblower Act provides that a public employee may recover reasonable attorneys' fees *in addition to* other damages and costs. Tex. Gov't Code Ann. § 554.003(a)(5) (West 1994) (emphasis added). The language of similar statutes supports the award of attorneys' fees in addition to damages. The Deceptive Trade Practices Act allows a prevailing consumer to recover "reasonable and necessary attorneys' fees." Tex. Bus. & Com.Code Ann. § 17.50(d) (West 1987 & Supp.1997). This allows the winning plaintiff to recover the full amount of damages suffered rather than bear the burden of reasonable costs incurred in prosecuting the defendant for the deceptive act. *Berry Property Management Inc. v. Bliskey,* 850 S.W.2d 644, 670–71 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.). We hold that Strube is entitled to recover reasonable attorneys' fees in addition to her damages.

The County also contends the evidence does not support the award of attor-

neys' fees. The jury was asked to determine a reasonable fee for the necessary services of Strube's attorneys by *stating a percentage.* Recently, in *Arthur Andersen & Co. v. Perry Equipment Corp.,* 945 S.W.2d 812 (Tex.1997), the supreme court held that a plaintiff can no longer simply ask a jury to award a percentage of the damages as attorneys' fees. *Id.* at 819. Although a party's contingency fee agreement may be considered by the factfinder, it alone provides the jury with no meaningful way to determine if the actual amount of attorneys' fees was in fact reasonable and necessary. *Id.* The plaintiff must prove the fees were both reasonably and necessarily incurred in the prosecution of the case and ask the jury for a specific dollar amount. *Id.* In reaching the dollar amount, the factfinder must consider the following factors:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Id.* at 817–18 (quoting Tex. Disciplinary R. Prof. Conduct 1.04, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit.G app. (State Bar Rules, art. X, § 9)).

■■■ Strube contends the County *waived error in the submission of attorneys'* fees by not objecting to the failure to ask the jury for a specific dollar amount. Counsel stated:

There is no evidence from [Spivey] that would justify the submission of the question asking the jury to determine a percentage of attorney's fees to be added to the recovery of the Plaintiff in this case, and we would object to the submission of that charge—of that particular question at all.

We note that at the time of this trial the supreme court had not yet issued its opinion in *Perry Equipment.* Until recently, evidence of a contingency fee agreement would have supported an award of attorneys' fees under the Whistleblower Act. *Texas Animal Health Comm'n v. Miller,* 850 S.W.2d 254, 257 (Tex.App.—Eastland 1993, writ denied). However, when the applicable law changes during the pendency of an appeal, a court of appeals must render its decision in light of the change in the law. *Blair v. Fletcher,* 849 S.W.2d 344, 345 (Tex.1993). Generally, a decision of the supreme court operates retroactively unless the court exercises its discretion to provide otherwise. *Bowen v. Aetna Casualty & Sur. Co.,* 837 S.W.2d 99, 100 (Tex.1992). Taking into account the fact that the parties did not have the *Perry Equipment* guidelines, we conclude the County's objection adequately preserved error. Because there was insufficient evidence for the jury to determine whether the amount was reasonable and necessary, we reverse the award of attorneys' fees. We are authorized to reverse and remand only the award of attorneys' fees. *ASAI Corp. v. Vanco Insulation Abatement, Inc.,* 932 S.W.2d 118, 124 (Tex.App.—El Paso 1996, no writ). We sustain the County's fourth point of error.

### Exemplary Damages

■■■ By point of error five, the County contends the evidence is legally and factually insufficient to support the finding of malice necessary to award exemplary damages. *City of San Antonio v. Heim,* 932 S.W.2d 287, 293 (Tex.App.—Austin 1996, writ denied) (citing *Kneuper,* 768 S.W.2d at 457). The jury charge defined "malice" as

either conduct specifically intended to cause Strube substantial injury or an act carried out with blatant disregard for her rights and actual awareness that the act

would, in reasonable probability, result in harm to her.

The County did not object to the submission of the exemplary damages question or the submitted definition of malice.

The supreme court recently discussed the level of proof required to support an award of punitive damages in a suit under the Texas Anti–Retaliation law. *See Continental Coffee Prods. v. Cazarez*, 937 S.W.2d 444 (Tex.1996). In holding that the employee must prove the employer acted with actual malice, as opposed to malice implied from the employer's wrongful or intentional conduct, the court stated:

> We recognize that an employer's violation of [the anti-retaliation law] is an unlawful and wrongful act. Yet, in most types of cases, "the fact that an act is unlawful is not of itself ground for an award of exemplary or punitive damages. The act complained of not only must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful."

*Id.* at 454. The court found nothing in the anti-retaliation statute to indicate legislative intent that malice may be implied from the employer's intentional wrongdoing, noting it provided only for "reasonable damages incurred by the employee as a result of the violation." *Id.* at 453–54. By contrast, the 1993 version of the Whistleblower Act applicable in this case explicitly provided for the recovery of exemplary damages.[3] In *Wichita County v. Hart*, 892 S.W.2d 912 (Tex. App.—Austin 1994), *rev'd on other grounds*, 917 S.W.2d 779 (Tex.1996), a suit also brought under the 1993 Whistleblower Act, we found sufficient record evidence to support a jury finding that the employer acted with malice in terminating the employees. In *Hart*, the jury was instructed that malice is "ill will or evil motive, or such gross indifference to or reckless disregard of the rights of others as will amount to a willful or wanton act."

As noted, the County did not object to the submitted definition of malice. While the definition did not include the terms "ill will" or "evil motive," it did require the jury to find intent to cause *substantial* injury or a *blatant disregard* for Strube's rights, which we think goes beyond mere intentional retaliation. In any event, the evidence in this case is stronger than in either *Cazarez* or *Hart* and would support an award of punitive damages under the definition of actual malice set forth in *Cazarez*. The evidence shows Strube's supervisors first ignored her injuries resulting from her use of the cleaning products and called her a disloyal employee after she reported the incident to the Department of Health. Her supervisors then began to treat her differently regarding her work assignments and scheduling in spite of legitimate health concerns to herself and her family. In particular, her supervisors failed to assign her to light duty work after she presented a doctor's note following a shoulder injury. Strube was assigned to four weeks of supervising inmates who were sex offenders. When Strube filed complaints regarding harassment by these inmates, they were not addressed and, contrary to department policy, the inmates suffered no consequences due to her reports. Voluntary overtime was no longer available to Strube although mandatory overtime was required. The jail administrator's comment that the department was "going to have to fire her" when it was all over, along with Sheriff Keesee's telephone call to Strube at home, demonstrate the department's intent to retaliate. The sheriff's assurances that no retaliation would result could have been interpreted by the jury as disguised threats. Additionally, Strube's notice of the disciplinary hearing that resulted in her termination was broadly worded and vague; the department denied her request for more information about the nature of the accusations. While a late-night videotape had been made in which an inmate accused Strube, she was not allowed to view the tape or stay in the room when the inmate and other witnesses testified before the disciplinary board. We conclude that, based

---

3. The 1995 amendments to the Act removed punitive damages from the types of available relief.

Tex. Gov't Code Ann. § 554.003 (West Supp. 1997).

upon the evidence presented, the jury could have determined the sheriff's department acted with ill will or evil motives when it retaliated against Strube. The jury could also find the department acted in blatant disregard for her rights and was aware that terminating Strube's employment would result in her being unemployed and be taken as a negative mark on her employment record in the law enforcement profession. We conclude that the evidence is legally and factually sufficient to support the jury's finding of malice.

■■ The County alternatively urges us to order a remittitur lowering the $1,250,000 in exemplary damages to a reasonable amount. Although the County failed to adequately brief this argument, we nevertheless will address this contention. *See* Tex.R.App. P. 38.1(h) (former Tex.R.App. P. 74(f)).

■■■■ An appellate court reviews exemplary damages awards to ensure that they are reasonable in their amount and rational in light of their purpose to punish malicious conduct and deter its repetition. *Heim*, 932 S.W.2d at 294. We may reverse an exemplary damages award or suggest a remittitur only if we determine that the evidence supporting the award is so factually insufficient or the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* (citing *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex.1994)). In our assessment, we consider the following factors:

> (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety.

*Id.* (citing *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981)). When reviewing an exemplary damages verdict for excessiveness, we must detail the relevant evidence and explain why, in light of the *Kraus* factors, the evidence either supports or does not support the exemplary damages award. *Id.* (citing *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 798 (Tex.1994)). We have detailed the evidence previously.

We assess the nature of the wrong in light of the purposes underlying the Whistleblower Act of 1) protecting public employees from retaliation by their employers for reporting violations of law in good faith, and 2) securing in consequence lawful conduct on the part of those who direct and conduct the affairs of public bodies. *See Travis County v. Colunga*, 753 S.W.2d 716, 718–19 (Tex.App.—Austin 1988, writ denied). Strube first attempted to alert her employers of the dangerous cleaning chemicals before turning to the Department of Health. Her employers shunned her attempts and then retaliated against her for pursuing a policy of safety in the workplace. After her report, several of Strube's superior officers notably resented the incident and purposefully made her job more difficult. She was assigned to sex offender duty and her complaints regarding these inmates were ignored. The sheriff called her at home. One officer threatened to ruin her life. These actions, as well as others detailed earlier, by this public entity are offensive to a public sense of justice and propriety. This is the type of conduct exemplary damages is meant to punish and deter. The jury found the County should pay exemplary damages nearly twice the amount of actual damages. We hold the jury did not award exemplary damages in such an amount as to be clearly wrong and unjust. Therefore, we decline to order a remittitur and overrule the County's fifth point of error.

### CONCLUSION

The judgment of the trial court awarding $50,000 in damages for future mental anguish is reversed and rendered that Strube take nothing on that claim. We also reverse the portion of the judgment regarding attorneys' fees and remand it to the trial court for further proceedings consistent with *Arthur Andersen & Co. v. Perry Equipment Co.* In all other respects, the judgment of the trial court is affirmed and the motions for rehearing are overruled.