Opinion filed February 2, 2006







In The





Eleventh Court of Appeals


__________



No. 11-03-00336-CV 


__________



TEXAS MOTO-PLEX, INC., Appellant



V.



JOHN PHELPS AND BRYCE HAWK, Appellees






On Appeal from the 268th District Court



Fort Bend County, Texas



Trial Court Cause No. 01-CV-122108






M E M O R A N D U M O P I N I O N



 This case involved an accident at a motocross facility when a rider, John Phelps, struck a
tractor performing track maintenance behind a jump. The other rider, Bryce Hawk, missed the
tractor but was also injured. Phelps and Hawk sued Texas Moto-Plex, Inc. and obtained a judgment
for actual and punitive damages. Texas Moto-Plex appeals, contending that plaintiffs' claims were
barred by a pre-accident release; plaintiffs' expert was improperly allowed to testify about James
Teague's (a co-owner of the track) subjective awareness of an extreme degree of risk to the riders;
the evidence was legally and factually insufficient to show gross negligence; the riders were
contributorily negligent; the punitive damages awarded to Hawk were excessive; and the trial court
applied the wrong prejudgment and postjudgment interest rate. We find the punitive damages
awarded to Hawk are excessive but, otherwise, affirm.

Background Facts


 Phelps and Hawk traveled to Texas Moto-Plex, a new motocross track in Fort Bend County,
to practice riding. Texas Moto-Plex charged riders an entrance fee and required them to sign a
release. Phelps went to the registration shed to pay the fees and sign the release. A Texas Moto-Plex
employee told Phelps that two tractors and a bulldozer were grooming the back section of the track.
Phelps walked outside, saw the equipment, and then paid for both. With Hawk's permission, Phelps
signed the release for both. Phelps told Hawk about the track maintenance. Hawk looked toward
the track and observed the bulldozer working.

 Phelps and Hawk finished unloading their bikes and putting on their riding gear. They
entered the track from the designated starting gate and slowly rolled the track on their motorcycles
to check its condition. They saw the tractors and bulldozer working on the back portion of the track
and were able to avoid them using a detour created by previous riders.

 Phelps and Hawk rode for approximately two hours, during which time they took two breaks. 
They refueled one of the motorcycles during the brief second break. When they reentered the track,
they did so at the second turn rather than the starting gate. Also during this break, Lindsay
Wadsworth moved the tractor he was operating from the back side of the track to the area between
the first jump and third turn.

 Phelps and Hawk were unaware that Wadsworth had moved the tractor. They did not do
another slow roll but proceeded to ride at normal speed. They did not see the tractor until they were
airborne coming off of the first jump. Hawk was able to avoid the tractor by jumping off of his
motorcycle. He sustained only minor injuries and did not require medical assistance. Phelps,
however, struck the tractor and broke his leg. Phelps ultimately required two surgeries.

 Phelps and Hawk sued Texas Moto-Plex for negligence and gross negligence. Texas Moto-Plex admitted its negligence but denied that it was grossly negligent and contended that Phelps and
Hawk were at least partly to blame for their own injuries. The case was tried to a jury which found
Texas Moto-Plex solely responsible for the injuries and awarded Phelps actual damages of $191,931
and Hawk actual damages of $1,000. The jury also found that their injuries resulted from Texas
Moto-Plex's gross negligence and awarded each plaintiff exemplary damages of $75,000.

Were the Claims Barred by the Release?


 Prior to riding, Phelps signed a document entitled "Release and Waiver of Liability,
Assumption of Risk and Indemnity Agreement" for himself and Hawk. The preprinted form contains
broad releases for injuries arising out of, or related to, an "event" which on that day was stated to be
"Texas Moto-Plex - Practice." Texas Moto-Plex concedes that it was negligent but argues that the
release exonerated it from any liability for negligent acts that occurred at the motocross facility. 
Texas Moto-Plex also concedes that the release did not include acts or omissions amounting to gross
negligence.

 Phelps and Hawk concede that the release is unambiguous and that it satisfies the express
negligence test. They contend that the release is ineffective because of the jury's gross negligence
finding and because, even if Texas Moto-Plex was only negligent, their injuries were caused by
activities beyond the release's scope. Specifically, Phelps and Hawk contend the release covers
activities and risks inherent in motocross riding but not injuries caused by track maintenance
equipment.

 Pre-accident releases of gross negligence violate Texas public policy. Smith v. Golden
Triangle Raceway, 708 S.W.2d 574, 576 (Tex. App.--Beaumont 1986, no writ); accord Mem'l Med.
Ctr. of East Texas v. Keszler, M.D., 943 S.W.2d 433 (Tex. 1997)(citing Golden Triangle with
approval). Consequently, if the jury's finding of gross negligence is affirmed, it is unnecessary to
determine whether the maintenance activities fell within the scope of the release. In analyzing the
sufficiency of the evidence for gross negligence, we will first determine whether appellees' expert
was appropriately allowed to testify about Texas Moto-Plex's knowledge.

Did the Trial Court Err by Allowing Appellees' Expert to Testify 


Regarding Texas Moto-Plex's Knowledge?



 Phelps and Hawk were required to obtain a malice finding to recover punitive damages. The
statute in effect at the time for this case, Tex. Civ. Prac. & Rem. Code § 41.001(7)(B) (1997), 


defined "malice" as either a specific intent to cause substantial injury (which was not alleged) or an
act or omission:

 (i) which when viewed objectively from the standpoint of the actor at the time
of its occurrence involves an extreme degree of risk, considering the probability and
magnitude of the potential harm to others; and


 (ii) of which the actor has actual, subjective awareness of the risk involved,
but nevertheless proceeds in conscious indifference to the rights, safety, or welfare
of others. (1)

 

The current statute defines "malice" as a specific intent to cause substantial injury or harm, and the
former alternative definition of "malice" is now the definition for "gross negligence." In this
opinion, we use the terms "malice" and "gross negligence" as synonyms. 

 Texas Moto-Plex argues that the trial court erroneously allowed appellees' expert, Randall
Alan Nelson, to testify that Texas Moto-Plex had actual, subjective awareness of an extreme degree
of risk. (2) Texas Moto-Plex does not dispute that Nelson was a motocross expert, and the record
supports that proposition. Nelson had ridden and raced motorcycles since the 1950s and had served
as a referee and technical director for two national motorcycle associations.

 The trial court's decision to admit Nelson's testimony is subject to an abuse of discretion
review, Nat'l Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527-28 (Tex. 2000), and a harmful
error analysis. Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000).

 There are significant limits on the ability of a person to testify about another's state of mind
and to offer expert opinions. Texas Moto-Plex correctly notes that under Tex. R. Evid. 702 expert
testimony must be based upon "scientific, technical, or other specialized knowledge" as to which a
witness could be qualified as an expert by "knowledge, skill, experience, training, or education" and
that it must "assist the trier of fact to understand the evidence or to determine a fact in issue." 

 Texas Moto-Plex, however, overstates the extent of Nelson's testimony. Nelson's testimony
was not an unsupported, conclusory opinion on Texas Moto-Plex's state of mind but, rather, was
more fairly described as a recitation of largely undisputed facts. This is best shown by the following
testimony:

 Q. Please explain what acts or omissions of the owners of Texas Moto-Plex,
when viewed from their standpoint at the time of the occurrence, involved an extreme
degree of risk considering the probability of the potential harm to others and of which
were -- they were aware of the risk involved, but nevertheless proceeded with
conscious indifference.


 A. I think that they had an understanding that these motorcycles are traveling
at significant speeds, certainly 40 to 60 miles an hour, maybe greater speeds. And
I certainly believe that they would have an understanding that if one of these
motorcycles ran point-blank into a piece of earthmoving equipment, that it would be
catastrophic for the operator. I think they also knew that motorcycles are circuiting
this course when they put this piece of equipment there, and they put that piece of
equipment there giving instructions to a sixteen-year-old person for operating it. So
I -- I just believe they had to understand that what an impact between a motorcycle
and one of these vehicles could do to an operator, could kill them easily, and
certainly that they're moving these pieces of equipment without -- certainly we
understand they had some notice that they were on the back side at some point in
time, but with no additional notice they're moving them around the track in a hide-and-go-seek kind of a situation where the -- it could be devastating, and in fact was
devastating in this case. (3)

 

 The record establishes that these facts were undisputed and were known to Texas Moto-Plex. 
The senior Texas Moto-Plex official present at the time of the accident was Teague. He was a co-owner of the track and was driving one of the tractors. Texas Moto-Plex's employee, Joe Salinas,
testified that riders usually hit the first jump traveling more than forty miles an hour with the more
aggressive riders doing fifty to sixty miles an hour. Clearly, if a motorcycle traveling at that speed
hit a tractor or bulldozer, one could expect serious injuries to result. Teague admitted that the track
was open while the equipment was performing its maintenance activities. The tractor behind the first
jump was being driven by Lindsey Wadsworth, who was seventeen years old at the time. Teague
is the one who told Wadsworth to go work the area between the first jump and third turn. Phelps and
Hawk were warned about the equipment when they arrived but received no notice that Wadsworth's
tractor was being moved.

 Nelson, therefore, did not testify that Teague or Texas Moto-Plex knew an objective fact to
which they themselves did not admit. Nelson himself limited his testimony to Teague's subjective
knowledge, testifying in response to cross-examination:

 Q. Okay. Now you don't judge whether somebody is guilty of malice by the
result, you judge with foresight, not with hindsight. That is, we're trying to figure
out whether Mr. Teague was guilty of malice when he sent Mr. Wadsworth over to
operate the tractor based on what he knew then, actually knew, not what he should
have known. Do you understand the difference?


 A. I'm not able to tell you, based on that legal description, if you're asking
me what he knew or should have known. He should have known, certainly, that that
was a[n] extreme hazard. Now, whether he actually said "I'm going to send him over
there knowing that's an extreme hazard," I can't tell you that.

 

 Consequently, it was not error for the trial court to allow Nelson to answer the challenged
questions. Alternatively, if it was error, it was not harmful because Texas Moto-Plex's sufficiency
challenges can be resolved without reference to the challenged testimony as will be shown below.

Does the Record Support the Jury's Malice Finding?


 The jury found that the injuries of Phelps and Hawk resulted from Texas Moto-Plex's malice
which Phelps and Hawk were required to prove by clear and convincing evidence. Tex. Civ. Prac.
& Rem. Code Ann. § 41.003 (Vernon 1997). Texas Moto-Plex challenges these finding on legally
and factually insufficient evidence grounds.

 When the burden of proof is by clear and convincing evidence, evidence is legally
insufficient when no reasonable fact-finder could form a firm belief or conviction that the matter to
be proven is true. In re J.F.C., 96 S.W.3d 256, 264-65 (Tex. 2002). For this review, we must
consider all the evidence and not just the evidence favoring the verdict. City of Keller v. Wilson, 168
S.W.3d 802, 817 (Tex. 2005). For factual sufficiency challenges, the question is whether the
evidence is such that a fact-finder could reasonably form a firm belief or conviction that the
defendant is guilty of malice. In re C.H., 89 S.W.3d 17, 18-19, 25 (Tex. 2002).

 Section 41.001(7)(B)'s definition of malice mirrors the Texas Supreme Court's definition
of gross negligence in Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994). A review of case
law discussing gross negligence findings is, therefore, helpful in addressing this issue.

 Malice or gross negligence requires much more than ordinary negligence. Rather, a plaintiff
must prove the presence of both an objective element (extreme risk) and a subjective element (actual
awareness). See Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 921 (Tex. 1998). Extreme risk
requires more than the remote possibility of injury or a high probability of minor harm but instead
requires proof that serious injury to the plaintiff was likely. Universal Servs. Co. v. Ung, 904 S.W.2d
638, 641 (Tex. 1995). Actual awareness requires proof that the defendant knew about the peril but
that its acts or omissions demonstrate that it did not care. See Wal-Mart Stores, Inc. v. Alexander,
868 S.W.2d 322, 326 (Tex. 1993).

 A. Extreme Risk

 It is undisputed that maintenance work was being performed by a bulldozer and two tractors
when Phelps and Hawk arrived at the track, that they were advised of this, and that they did in fact
see the equipment before entering the track. It is also undisputed that Phelps and Hawk took a slow
lap when they entered the track, that they saw the equipment, and that they noted a detour path made
by previous riders. Phelps and Hawk rode on the track for approximately two hours during which
time the equipment remained in the same location. While taking a break, one of the tractors moved
from the back to an area between the first jump and third turn.

 Phelps and Hawk received no express warning that the tractor had been moved. No track
employee told them about the movement; and no flags, signs, or other warning devices were
employed. Texas Moto-Plex contends that Phelps and Hawk failed to enter the track at the starting
gate and that, if they had done so, they would have seen the tractor. Texas Moto-Plex also argues
that, if they had taken a slow lap before resuming their ride, they would have seen the tractor. Those
assertions, however, are not relevant to the question of whether moving the equipment so that it was
behind a ramp without providing appellees an express warning created an extreme risk.

 The jury's finding is adequately supported even without reference to the disputed expert
testimony. It is common knowledge that motocross riding involves high speeds and jumping. In
fact, tracks are designed to facilitate that with the use of dirt ramps and banked turns. Having
tractors engaged in maintenance activities on the track at the same time as it is being used by
motocross riders creates the very risk manifested here: collisions between riders and equipment.

 B. Subjective Awareness

 This was a new track. Teague, a co-owner, was on-site and performing track maintenance
at the time of the accident. Wadsworth, a young motocross rider, was performing volunteer
maintenance work using one of the track's two tractors. They were working on the back of the track
when appellees arrived. Eventually, Teague instructed Wadsworth to move to the area around turn
three. Teague testified that he did not expect Wadsworth to work on any other area besides turn
three and that he never saw him more than one-half way between the turn and the first jump.
Wadsworth testified that Teague instructed him to work the area between the back end of the third
turn and the bottom of the first jump.

 Salinas, a track employee, was also present at the time of the accident. The track's soil had
a high clay content and needed periodic work to keep it suitable for motocross activities. Salinas and
Teague had talked about closing the track two to three days a week for tractor work. They never did
because they needed the revenue they received from riders for practice days. Salinas and Teague also
discussed using flaggers; and, according to Salinas, Teague agreed they should probably use them. 
This was apparently not done due to the same financial constraints.

 Motocross is an individual sport involving both skill and strategy. Motocross tracks are
designed with this in mind. Teague acknowledged, for example, that every rider is different and that
different people would hit the first jump differently. Teague testified that he would travel
approximately ten feet on the first jump, while others might travel as far as seventy-five feet. Riders
will travel at considerably different speeds due both to different levels of skill and at different parts
of the track. It is not unusual for them to travel between forty to sixty mph.

 There was considerable dispute about how much a careful rider might see beyond the first
jump as he approached it and where one should start riding on the track. For example, Teague
testified that he always rode looking two turns ahead. Phelps and Hawk, on the other hand, testified
that they were required to pay attention to the track in front of them and that it was impossible for
them to see what was on the back side of the first jump. Texas Moto-Plex contended that Phelps and
Hawk should have begun at the starting gate. Phelps and Hawk testified that everyone who was not
practicing their racing starts started where they did and that it was safer to do so.

 Although Salinas testified that he told Phelps that the equipment might move, Phelps was
adamant in his testimony that Salinas had not said that. Phelps testified that his impression from
what Salinas said that day was that the tractors would only be working in the area where he first saw
them.

 Teague disputed the need for flaggers or other express warning devices contending that he
did not realize Wadsworth was so close to the bottom of the first jump and that the accident would
have been avoided if appellees had been more careful by taking a slow lap or entering the track at
the starting gate. Teague also contended it was common practice for machinery to operate on the
track during practice sessions. Nelson, on the other hand, testified that track maintenance should not
be going on while riders are on the track. Nelson also testified that, in sending Wadsworth to work
between the third turn and first jump, Teague had to realize that he created a hazard that posed a high
degree of risk to the riders.

 It was the jury's role to resolve this conflicting testimony. Golden Eagle Archery, Inc. v.
Jackson, 116 S.W.3d 757, 761 (Tex. 2003)(jurors are the sole judges of the credibility of the
witnesses and the weight to be given their testimony). We believe that testimony in the record is
both legally and factually sufficient to establish:

 (1) Teague was aware heavy equipment and motorcycle riders were on the track at
the same time; 


 (2) Teague opted to do this for economic reasons rather than close the track or utilize
an express warning system;


 (3) Teague asked Wadsworth to move his tractor from the back side of the track to
work the area between the third turn and first jump;


 (4) Teague was aware Wadsworth's tractor was operating between the third turn and
first jump; 


 (5) Riders approaching the first jump would have at least reduced ability to see
equipment on the jump's back side;


 (6) If a motorcycle rider struck a tractor or bulldozer it could cause considerable
injury; and


 (7) Teague did not advise the riders on the track that the equipment was being moved
to a different location.


 There was legally and factually sufficient evidence that Teague and thus Texas Moto-Plex
created an extreme risk and was subjectively aware of that risk but chose to proceed nonetheless with
conscious indifference to the safety of Phelps and Hawk. Texas Moto-Plex's legal and factual
sufficiency challenges to the jury's malice findings are overruled.

Defendant's Contributory Negligence Claim


 The jury found that Texas Moto-Plex was solely responsible for Phelps's and Hawk's 
injuries. Texas Moto-Plex contends that Phelps's and Hawk's contributory negligence was
established as a matter of law or, alternatively, that the jury's finding of no contributory negligence
was against the great weight and preponderance of the evidence. Because Texas Moto-Plex had the
burden of proof, it must demonstrate that all the evidence established as a matter of law all vital facts
in support of its contributory negligence claim to prevail on its legal sufficiency challenge. Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001); Sterner v. Marathon Oil Co., 767 S.W.2d
686, 690 (Tex. 1989). We must first examine the record for evidence that supports the jury's finding
while ignoring all evidence to the contrary. If there is no evidence to support the finding, we then
examine the entire record to determine if the contrary proposition is established as a matter of law.
Id. 

 To prevail on a factual sufficiency challenge, Texas Moto-Plex must demonstrate that the
jury's finding is against the great weight and preponderance of the evidence. Dow Chem. Co., 46
S.W.3d at 242. This requires us to consider all of the evidence. We can set aside a verdict only if
the evidence is so weak or if the finding is so against the great weight and preponderance of the
evidence that it is clearly wrong and manifestly unjust. Id.

 Texas Moto-Plex contends Phelps and Hawk were contributorily negligent because they
failed to use the designated starting gate to reenter the track after their second break and because they
failed to visually locate the tractors and bulldozer when they reentered the track.

 A. Analysis of Contributory Negligence as a Matter of Law

 Phelps and Hawk entered the track at the starting gate when they first arrived and, thereafter,
entered at the second turn. Texas Moto-Plex contends that it was negligence, as a matter of law, for
them to enter the track anywhere but at the starting gate. Phelps testified that he had previously seen
people use the track's starting gate but that they were practicing their racing starts. On the day of
the accident, there were six to eight other riders. None of them used the starting gates. Instead,
everyone started at the second turn, which according to Hawk was safer because it gave riders greater
visibility of other motorcycles. Moreover, neither Phelps nor Hawk was ever advised by Texas
Moto-Plex officials that they should enter the track differently or at a different location. 

 Phelps and Hawk took a slow roll on their first lap. They did not take a slow roll after their
second break. They had been at the track for approximately two hours. During that time, the heavy
equipment was always in the same place, even after their first break. Their second break was a short
one to refuel Hawk's motorcycle. They were stopped for only a few minutes and did not even take
off any of their equipment. Phelps testified that Salinas had indicated that the equipment would only
be operating in the original area.

 During this break, Wadsworth drove his tractor from the back of the track to the area between
the first jump and third turn. Phelps and Hawk testified that the tractor was not in plain sight for a
rider on the track because they were focused on the immediate portion of the track. As they
approached the first jump, Phelps and Hawk were going sixty to seventy miles an hour; they were
focused on an upcoming turn and on other riders.

 There was some evidence that appellees were not negligent. Texas Moto-Plex's claim that
Phelps and Hawk were contributorily negligent as a matter of law is overruled.

 B. Analysis of No Contributory Negligence Finding As Against the Great Weight and
Preponderance of the Evidence

 Texas Moto-Plex introduced evidence that, if Phelps and Hawk had been more careful, they
could have seen the tractor and avoided the accident. Phelps and Hawk were aware that equipment
was present on the track. Had they taken a slow lap after their second break or started at the starting
gates, the accident could have been avoided. Texas Moto-Plex introduced evidence that riders have
an obligation to protect themselves by remaining aware of any heavy equipment's location. It also
introduced evidence that prudent riders will take a slow lap before beginning any ride.

 We cannot, however, say that this evidence, when compared to the evidence discussed above,
is so against the great weight and preponderance of the evidence that it is clearly wrong and
manifestly unjust. Texas Moto-Plex's claim that the jury's finding of no contributory negligence was
against the great weight and preponderance of the evidence is overruled.

Punitive Damages


 The jury awarded Phelps compensatory damages of $191,931 and punitive damages of
$75,000. The jury awarded Hawk compensatory damages of $1,000 and punitive damages of
$75,000. Texas Moto-Plex challenges the award to Hawk contending it is based upon factually
insufficient evidence or, alternatively, it is constitutionally excessive.

 A. The Test for Factual Sufficiency

 Exemplary damage awards must be reasonable in amount and rational in light of their
purpose to punish malicious conduct and deter its repetition. Lubbock County v. Strube, 953 S.W.2d
847 (Tex. App.--Austin 1997, pet. denied). We may reverse an exemplary damage award or suggest
a remittitur only if we determine that the evidence supporting the award is so factually insufficient
or the verdict is so against the great weight and preponderance of the evidence as to be manifestly
unjust. Id. The Texas Supreme Court has adopted five factors, commonly referred to as the "Kraus"
factors, for our analysis. They are:

 (1) the nature of the wrong;

 (2) the character of the conduct involved;

 (3) the degree of culpability of the wrongdoer;

 (4) the situation and sensibilities of the parties concerned; and

 (5) the extent to which such conduct offends a public sense of justice and propriety. 

Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981).

 The relevant evidence, without reference to the challenged expert testimony, has been
discussed above in our review of the sufficiency of the jury's malice finding and will not be repeated
here. We believe that the evidence is factually sufficient to support a punitive damage award. The
amount of that award is, in our opinion, controlled more by recent constitutional authority rather than
the application of the Kraus factors; and, therefore, we will turn to constitutional principles to review
the propriety of the jury's award.

 B. The Test for Constitutional Due Process

 Courts have long struggled to ascertain the constitutional limits on punitive damage awards. 
The U.S. Supreme Court recently revisited this issue in State Farm Mut. Auto. Ins. Co. v. Campbell,
538 U.S. 408 (2003). The Court recognized that states possess discretion over the imposition of
punitive damages but that this discretion is limited by the Due Process Clause of the Fourteenth
Amendment which prohibits the imposition of grossly excessive or arbitrary punishments. Id. at
416.

 The Supreme Court in Campbell reaffirmed BMW of N. Am., Inc. v. Gore, 517 U.S. 559
(1996), and its three-part analysis for reviewing punitive damage awards. Campbell, 538 U.S. at
418. Courts are required to consider three guideposts: (1) the degree of reprehensibility of the
defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the
plaintiff and the punitive damages award; and (3) the difference between the punitive damages
awarded by the jury and the civil penalties authorized or imposed in comparable cases. Gore, 517
U.S. at 575. The Supreme Court, however, indicated that, while applying the second guidepost, "in
practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to
a significant degree, will satisfy due process." Campbell, 538 U.S. at 425.

 The jury's punitive damage award was seventy-five times Hawk's compensatory award. On
its face, this would suggest the award is constitutionally excessive. Hawk, however, correctly notes
that Gore allows consideration of not only the actual damages but also the potential for harm a
defendant's conduct caused. One need look only at Phelps's injuries to appreciate that Hawk was
fortunate and could easily have been more severely injured. Hawk asks us to not give Texas Moto-Plex "credit for the fortuitous outcome of this accident in Hawk's case."

 The Supreme Court has held that "the most important indicium of the reasonableness of a
punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517
U.S. at 575. Teague was guilty of poor judgment; but his conduct involved no intentional act, ill-will, spite, evil motive or the purposeful injury of another. Teague was not in a position of trust,
such as a fiduciary. Nor was any evidence introduced indicating any pattern of misconduct by
Teague or any other Texas Moto-Plex agent or employee.

 Phelps testified that he did not believe that anyone should be punished. Nelson, the expert,
agreed that Teague did not strike him as being cruel or criminal or as being a bad man. But, rather,
Teague seemed to be someone who made a mistake.

 We believe that Hawk's punitive damage award violates the Due Process Clause of the
Fourteenth Amendment. Texas Moto-Plex has requested a remittitur to reduce the award of $75,000
to $9,000 which would be nine times Hawk's actual damage award. Under the facts of this case, that
request is appropriate. 

Prejudgment and Postjudgment Interest


 Lastly, Texas Moto-Plex contends the judgment should be reformed to lower the prejudgment
and postjudgment interest rate to 5%. The trial court's final judgment awarded appellees
prejudgment and postjudgment interest of 10%. Tex. Fin. Code Ann. § 304.003 (Vernon Supp.
2005) controls the rate of prejudgment and postjudgment interest in a case such as this. The Texas
Legislature amended that statute during the 2003 legislative session.

 Texas Moto-Plex contends that the amended statute applies to this case and that the
prejudgment and postjudgment interest rate should be 5% rather than 10%. Texas Moto-Plex did
not raise this issue below. It acknowledges that an objection during trial is generally necessary but
argues in its reply brief that this is a requirement "only if the error is capable of being known by the
appellant when the final judgment is signed." Texas Moto-Plex contends that the amendment took
effect on June 20, 2003 (the judgment is dated August 26, 2003) but that it had no notice of the
amendment because West Publishing had not sent out a revised pocket part for the Finance Code at
the time of this trial. Consequently, it contends this issue may be properly raised for the first time
on appeal.

 Texas Moto-Plex cites no authority in support of its exception to Tex. R. App. P. 33.1(a), nor
are we aware of any. The parties have engaged in extensive discussion of what information was
available from West Publishing or on the internet and of what notice should counsel be charged. We
need not resolve that dispute today. Rule 33.1(a) is couched in mandatory terms: "As a prerequisite
to presenting a complaint for appellate review, the record must show . . . ." (emphasis added) See
also Wal-Mart Stores, Inc. v. McKenzie, 997 S.W.2d 278, 280 (Tex. 1999)(to preserve a complaint,
a party must present a timely request, motion, or objection to the trial court). Because this point was
not raised below, we may not consider it now. Texas Moto-Plex's final issue is overruled.

Conclusion


 The trial court's judgment is affirmed except for the award of excessive punitive damages
to Hawk. Texas Moto-Plex's request for a remittitur is granted. Pursuant to Tex. R. App. P. 46.3,
if within fifteen days of the date of this opinion Hawk files a remittitur of his punitive damage award
from $75,000 to $9,000, then the judgment will be reformed to reflect the remittitur and, as
reformed, affirmed. If the remittitur is not timely filed, then the trial court's judgment as to Hawk 
will be reversed; and his claim remanded to the trial court for a new trial.


 TERRY McCALL

 JUSTICE


February 2, 2006

Panel consists of: Wright, C.J., and McCall, J.


W. G. Arnot III retired effective July 31, 2005, and is, therefore, not participating.
1. Appellees filed suit on December 18, 2001. It was, therefore, subject to Tex. Civ. Prac. & Rem. Code § 41.001(7)(B) (1997). 
The current version of Section 41.001 redefined the alternative definition of "malice" as "gross negligence." Tex. Civ. Prac. & Rem.
Code Ann. § 41.001 (Vernon Supp. 2005).
2. Texas Moto-Plex specifically challenges the following three questions to Nelson:

 Q. Please explain what acts or omissions of the owners of Texas Moto-Plex, when viewed from their standpoint
at the time of the occurrence, involved an extreme degree of risk considering the probability of the potential harm to others
and of which were -- they were aware of the risk involved, but nevertheless proceeded with conscious indifference.


 Q. My question to you is can you think of any way that a person such as Jim Teague, who has ridden motocross
for 20-plus years, would not know that sending young Lindsay Wadsworth over to the opposite end of the track to work
behind a hidden jump without warning the riders posed an extreme degree of risk to my clients and the other riders that
were out there that day?


 Q. Let me ask you this: based on what you've come to learn about Mr. Teague, and more specifically, the
experience he has in this -- in this field, do you believe that Mr. Teague knew or had subjective awareness that he had posed
a great risk to the riders out there by sending Lindsay Wadsworth to work that area?
3. In response to the other two challenged questions, Nelson testified that Teague would have to have known that a tractor is a
massive object compared to a motorcycle and that putting a tractor in a blind area or even using it on the track created an extreme
risk.