

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00431-CV

MBR & ASSOCIATES, INC. AND
MARION BRIAN RAMON

APPELLANTS

V.

WILLIAM S. LILE

APPELLEE

----------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellants MBR & Associates, Inc. and Marion Brian Ramon appeal from the trial court's judgment for Appellee William S. Lile, signed after a bench trial. For the reasons set forth below, we will affirm the trial court's judgment.

---

[1]See Tex. R. App. P. 47.4.

## II. FACTUAL OVERVIEW

Lile hired MBR Guaranteed Foundation Repair (MBR-GFR)[2] to repair the foundation of his home based on MBR-GFR's representations that the company had master plumbers and engineers on staff, that the company had liability insurance to cover his property in the event of any damage to his property, and that a master plumber and engineer would oversee the job at his house. Ramon instructed the salespersons involved in obtaining Lile's contract to make these representations. Each of these representations was false. A forged and fake copy of a certificate of liability insurance was included in MBR-GFR's sales packet.

When MBR-GFR performed the "mudjacking" procedure on Lile's home, its workers negligently lifted the foundation too high, causing multiple fractures in the foundation and causing the sewer system pipes to crack and pull loose from sewer pipes in the foundation. No engineer or master plumber was supervising the job. The sewer system was filled with mudjacking concrete, which the workers did not notice until it was coming up through the toilet bowl in one bathroom, the drain of one bathtub, and the toilet opening in another bathroom. Upon discovering the mudjacking concrete rising through Lile's home's sewer system, the MBR-GFR workers left. Eventually, MBR-GFR sent Douglas Provenzano to Lile's home to attempt to clean the now-hardened mudjacking

_____

[2]The trial court found that MBR-GFR was a trade name used by Ramon individually.

concrete out of sewer system pipes at Lile's house. Provenzano represented himself to be—but was not—a master plumber. Provenzano jackhammered five holes into Lile's foundation inside his house looking for the main sewer line but could not find it. Ramon told Lile that he had liability insurance but that he was not going to turn in a claim because what had happened was not his fault and that he was not going to do anything further to help Lile. Appellants[3] then abandoned all efforts to complete or repair Lile's foundation. The mudjacking concrete injected into Lile's sewer system remained there through the date of trial. Lile's sewer system was inoperable, and his home was uninhabitable.

Lile asserted causes of action against Appellants for breach of contract, negligence, violations of the Deceptive Trade Practices-Consumer Protection Act (DTPA), fraud, and gross negligence. The trial court's findings of fact indicate that the trial court found for Lile on each element of each of these causes of action. The trial court found that the conduct of Appellants, including Ramon individually, was a direct, proximate, and producing cause of extreme emotional distress to Lile; he suffered physical illnesses—such as upset stomach, headaches, high blood pressure, depression, bouts of crying, loss of sleep, and loss of appetite. The trial court also found that this extreme emotional anguish

[3]MBR-GFR is not reflected as an Appellant in the style of this case. The trial court found that "MBR & Associates, Inc. was held out to the public and Lile as the entity responsible for and controlling MBR-GFR, when in reality Ramon was operating and controlling both entities, while hiding the truth from Lile" and that "MBR & Associates, Inc. and Ramon doing business as MBR-GFR, are one and the same and that's the way Ramon treated them."

has been constant, consistent, and ongoing on a daily basis since the mudjacking procedure occurred. The trial court awarded Lile the same amount of damages for each of his causes of action—including breach of contract, negligence, violations of the DTPA, and fraud. The total damages awarded included $2,000.00 for loss of the benefit of the bargain; $132,469.04 for the reasonable and necessary costs to repair Lile's house; $69,150.00 for temporary housing during the loss of the use of his house; $1,967.04 for reasonable and necessary mitigation expenses incurred by Lile in protecting his property from damage; $250,000.00 for mental anguish sustained by Lile in the past; and $50,000.00 for mental anguish damages which in reasonable probability will be sustained by Lile in the future. These damages were awarded against MBR & Associates, Inc. and Ramon, jointly and severally.

### III. STANDARD OF REVIEW WHEN TRIAL COURT ISSUES FINDINGS OF FACT

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *Sw. Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied). If a complete reporter's record exists in an appeal, the trial court's findings of fact are challengeable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's finding. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.

4

1994).  But unchallenged findings of fact are binding on an appellate court unless contrary findings are established as a matter of law or no evidence supports them.  *Milton M. Cooke Co. v. First Bank & Trust*, 290 S.W.3d 297, 303 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)).  Conclusions of law are not challengeable for factual sufficiency, but they may be reviewed to determine their correctness based upon the facts.  *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 277 (Tex. App.—Fort Worth 2002, no pet.).  A challenge to fact findings that form the basis of a conclusion of law or disposition will be overruled when the appellant does not challenge other fact findings that support that conclusion or disposition.  *Milton M. Cooke Co.*, 290 S.W.3d at 303; *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n, Inc.*, 178 S.W.3d 384, 397 (Tex. App.—Fort Worth 2005, pet. denied); *see also Oliphant Fin. L.L.C. v. Hill*, 310 S.W.3d 76, 77 (Tex. App.—El Paso 2010, pet. filed) (explaining that an appellant must attack all independent bases or grounds that fully support a complained-of ruling or judgment, or appellate court must affirm judgment or ruling).

Here, following the bench trial, the trial court issued 215 findings of fact and 33 conclusions of law comprising 39 pages in the clerk's record.  Appellants, in their brief, do not challenge any specific finding of fact or conclusion of law.  Additionally, although Appellants raise nine issues,[4] many of their issues do not

---

[4]Appellants' nine issues are as follows:

1. What is the proper measure of damages when the cost to repair real property exceeds the value of the property itself?

   a. Is cost of repair the proper measure of damages when the undisputed evidence shows that repairs are economically unfeasible?

   b. Is loss of use the proper measure of damages for permanent injury to real property?

2. Did the trial court err in denying, as a matter of law, Marion Brian Ramon's affirmative defense of limitations?

3. Did the Plaintiff suffer the type of injury for which mental anguish damages are recoverable?

4. Did the Plaintiff present sufficient evidence to support the award of past and future mental anguish?

5. Are the trial court's vicarious liability findings supported by sufficient evidence?

   a. Did the Plaintiff present sufficient evidence that MBR & Associates, Inc. is the alter ego of Marion Brian Ramon?

   b. Did the Plaintiff present sufficient evidence that either Frank Creed or Justin Bryant was the agent of Marion Brian Ramon?

6. Did the Plaintiff present sufficient evidence of proximate cause to support his fraud or DTPA claims?

7. Did the trial court err in concluding that no responsible third parties were liable for Plaintiff's damages?

8. Did the trial court miscalculate pre-judgment interest as to Marion Brian Ramon?

articulate alleged error by the trial court, and none of them set forth the standard of review that Appellants desire this court to apply. The argument portions of Appellants' brief on the issues raised by Appellants that generically query whether the trial court's findings are supported by "sufficient evidence" or whether Lile presented "sufficient evidence" do not identify any specifically challenged findings of fact, do not set forth a standard of review, and do not purport to analyze the evidence in the 11-volume reporter's record, the 278 exhibits, or the 6-volume clerk's record contained in this appeal as it relates to any finding of fact.

During oral argument, the court questioned Appellants' counsel regarding the unchallenged findings of fact. Following oral argument, Appellants filed a motion requesting to file, and we allowed Appellants to file, a supplemental brief setting forth the relevant findings of fact challenged in each of the issues raised in their appellate brief without any further analysis or additional issues. Because Appellants filed a supplemental brief listing the relevant findings of fact challenged in each of the issues they raised, we will address the issues necessary for final disposition of this appeal. *See* Tex. R. App. P. 47.1.

---

9. Is remand for a new hearing on exemplary damages appropriate in the event this Court reduces the amount of the Plaintiff's actual damages?

## IV. PROPER MEASURE OF REAL PROPERTY DAMAGES

In their first issue, Appellants claim that Lile can recover only diminution in value damages. Appellants base their argument on their conclusion that the damage to Lile's property involved a permanent injury because the cost to repair exceeded the decrease in market value of the property. Appellants further argue that due to the permanent injury to Lile's property, he cannot recover loss of use damages.

When, as here, damage to real property is involved, the correct measure of damages is a fact-specific inquiry. *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 32 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). If repair is feasible and does not cause economic waste, then the plaintiff may recover the cost of repair; otherwise, the plaintiff is entitled to the decrease in market value caused by the injury. *See id.*; *Samuel v. KTVU P'ship*, No. 08-02-00010-CV, 2003 WL 22405384, at *1 (Tex. App.—El Paso Oct. 22, 2003, no pet.) (mem. op. on reh'g) ("Texas courts have recognized that the proper measure of damages when the injury to realty is repairable is the reasonable cost of repairs necessary to restore the property to its prior condition.").

Here, Lile testified that the fair market value of his home when it was in good condition was $165,000 to $170,000. There was no evidence offered regarding the decrease in the fair market value of Lile's home after it was damaged. Based on the stipulation of the parties and on the testimony of Lile's expert Robert Nicholas, the trial court found that the reasonable and necessary

8

cost to repair Lile's home to rental status was $132,469.04.[5] Measuring the

$132,469.04 cost to repair to rental status against the fair market value of

$165,000 to $170,000 (because there was no evidence of the decrease in the fair

market value of Lile's home), it is clear that the cost to repair to rental status is

less than the home's fair market value. Lile thus proved that the house could be

repaired to rental status without economic waste and that he is therefore entitled

to cost of repair damages. *See Coastal Transp. Co. v. Crown Cent. Petroleum

Corp.*, 136 S.W.3d 227, 235 (Tex. 2004) (holding that Crown Central was entitled

to recover amount necessary to rebuild its facility because evidence at trial

supported jury's finding that Crown Central could rebuild its facility to its former

condition; market value damages were unavailable because cost to rebuild

damaged property was significantly less than the decrease in market value

caused by damage); *Control Solutions, Inc. v. Gharda USA, Inc.*, No. 01-10-

00719-CV, 2012 WL 3525372, at *35 (Tex. App.—Houston [1st Dist.] Aug. 16,

2012, no pet. h.) (holding that CSI was entitled to recover the amount necessary

to rebuild its facility and to compensate for its loss of use during the interim time

---

[5]This total consists of $105,864.00, which the parties stipulated was the cost to repair the interior of Lile's house; $38,000.00 to repair the sewer lines, less $11,394.96, which Lile had available for buildback that never took place due to Appellants' conduct.

9

period because testimony established that property was not a total loss and was rebuilt for less than its value).[6]

Lile was not required to prove both cost of repair and diminution in value; he, instead, had an election of which measure of damages to plead or prove. *See Miller v. Dickenson*, 677 S.W.2d 253, 258 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). The record is clear that Lile elected to proceed under the cost of repair measure of damages. If Appellants disagreed with the application of the cost of repair measure of damages, they had the burden of proving that the diminution in value was a smaller sum. *See id.* Appellants, however, do not point us to any evidence in the record of the diminution in value.

Appellants instead attempt to argue that economic waste would occur by awarding Lile cost of repair damages because Lile's expert Robert Nicholas testified that it would cost more to fix the house than what it would be worth. In their reply brief, Appellants set forth the relevant trial testimony from Nicholas, including his opinion that the house could be repaired to a state that it would be

---

[6]In his brief, Lile relied on *Hennen v. McGinty*, 335 S.W.3d 642 (Tex. App.—Houston [14th Dist.] 2011), which was overruled after his brief was filed. *See McGinty v. Hennen*, 372 S.W.3d 625, 629 (Tex. 2012). In *McGinty*, the trial court held that the evidence was legally insufficient to support the jury's finding that $651,230.72 was a reasonable and necessary cost to repair Hennen's home and that Hennen did not produce evidence of the difference in market value as of the date of closing. *Id.* at 626. Here, as discussed below, Appellants failed to timely challenge the reasonableness of Lile's cost of repair damages, and Lile did not pursue diminution in value damages. Thus, *McGinty* is distinguishable from the case before us.

presentable as rental or investment property.[7]  Nicholas's report, which was

admitted into evidence, is consistent with his trial testimony and contains the

following conclusion:

> Based on my inspections, I believe that the house can be salvaged. The foundation and plumbing will require extensive repairs and completely leveling the foundation is probably not feasible.  After renovations, the house would be considered more in the rental property category rather than primary residence.  The renovation will include adding new steel piling, re-shimming some of the existing steel pilings, repairing or replacing the sewer system, backfilling the openings in and around the foundation, patching the holes in the slab, instilling the gyp-board on the interior and finishing out the interior with new paint and texture, new floorings, new fixtures and new cabinets.

Based on the evidence presented at trial, including Nicholas's testimony

and his report, the trial court made finding of fact 110:

> The condition of the foundation cracks inside the house and the foundation could be permanently repaired, but the costs would exceed the value of the Lile house.  The cracks could be epoxied, but then the Lile house would be suitable only as a rental house,

---

[7]Appellants in their reply brief also challenge for the first time on appeal whether there was evidence that the repairs were economically feasible, arguing that "the only testimony regarding the economic feasibility of repairs compels a rejection of the award for cost of repairs based upon the economic waste rule." However, an issue raised for the first time in a reply brief is ordinarily waived and need not be considered by this court. *See McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see also City of San Antonio v. Schautteet*, 706 S.W.2d 103, 104 (Tex. 1986) (noting that appellate court should not have addressed issues raised for first time in reply brief on appeal).  Moreover, Appellants did not object, but rather stipulated, to the $105,864.00 cost to repair the interior of Lile's house.  *See, e.g., Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex. 1985) (stating that there was no objection to reasonableness and necessity when trial judge admitted into evidence plaintiff's exhibit reflecting cost of repairs and holding that error, if any, had been waived by failure to make a proper objection).

11

because a homeowner would not reasonably be expected to live in a house with a foundation in this condition, but Lile intends to live in the house after it is repaired.

As demonstrated by the expert's testimony and report and as summarized in finding of fact 110, this is a unique situation in which Lile, the homeowner, wanted to be back in his house so badly that he was willing to have it repaired to a rental property status at a cost less than the fair market value of the home, rather than have it repaired to a homeowner status at a cost that would exceed the fair market value of the home. Because Lile elected to pursue the cost of repair damage model; because the only evidence of the fair market value of Lile's home was his testimony that it was worth $165,000 to $170,000 in good condition; because the evidence supported the $132,469.04 cost of repair to rental status, which was comprised of $105,864.00 of costs to repair the interior, plus $38,000.00 of costs to repair the sewer lines, less $11,394.96 of costs that were available for buildback; because the $132,469.04 cost of repair to rental status was less than the $165,000 to $170,000 value of the home; and because there was no evidence of diminution in value measure of damages; the trial court did not err by awarding Lile cost of repair to rental status damages. *See Coastal Transp. Co.*, 136 S.W.3d at 235; *Control Solutions, Inc.*, 2012 WL 3525372, at *35. We therefore overrule Appellants' first issue.

## V. VICARIOUS AND INDIVIDUAL LIABILITY

In the fifth issue, Ramon argues that the trial court erred by finding him vicariously liable for the acts of MBR & Associates, Inc. Ramon challenges the

12

trial court's findings that MBR-GFR is the trade name of Ramon and that Ramon is the alter ego of MBR & Associates, Inc. Lile responds that Ramon d/b/a MBR-GFR is the alter ego of MBR & Associates, Inc.

A corporation is a separate legal entity that normally insulates its owners or shareholders from personal liability. *Schlueter v. Carey*, 112 S.W.3d 164, 169 (Tex. App.—Fort Worth 2003, pet. denied). The corporate fiction is disregarded based on alter ego, however, when a corporation is organized and operated as a mere tool or business conduit of another. *Id.* An alter ego relationship may be shown from the total dealings of the corporation and the individual, such as evidence of the degree to which corporate and individual property have been kept separate; the amount of financial interest, ownership, and control the individual has maintained over the corporation; and whether the corporation has been used for personal purposes. *Id.* (citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990)). In a tort case, the financial strength of the corporate tort-feasor is an important consideration. *Id.* (citing *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 375 (Tex. 1984)). If the corporation sued is not reasonably capitalized in light of the nature and risk of its business, the need might arise to attempt to pierce the corporate veil. *Id.*

Here, the trial court made numerous findings of fact related to its determination that Ramon was the alter ego of MBR & Associates, Inc., and the record supports the trial court's findings. Our review of the record reveals that Ramon testified that he treated MBR & Associates, Inc. and MBR-GFR as "one in

13

the same" and agreed when asked if "[a]ll of you are just one entity, right?" The two entities shared the same phone number and office, and MBR-GFR did not file a separate tax return, nor did it have its own federal tax identification number. Ramon owned 100% of MBR & Associates, Inc. and was the president and CEO of MBR-GFR. The individuals who worked on Lile's house under the auspices of MBR-GFR were paid with checks written on MBR & Associates, Inc.'s account. Of the alter ego findings of fact that the trial court made, Ramon does not challenge finding of fact 190, in which the trial court found that MBR & Associates, Inc. has no employees, assets, equipment, vehicles, telephone number, or business office address, yet it pays all bills for MBR-GFR, carries all MBR-GFR employees and workers as the corporation's employees and workers for banking and income tax purposes, and accepts all accounts receivable to MBR-GFR. Nor does Ramon challenge finding of fact 191, in which the trial court found that MBR & Associates, Inc. owned a house valued at $1.8 million on Joe Pool Lake, a house in which Ramon and his family live and that was transferred out of the corporation's name shortly before the trial.

Analyzing the factors from *Schlueter* that are set forth above—including that Ramon's individual property was not kept separate from the corporation's, that the corporation was used for the personal purpose of holding Ramon's home, and that Ramon was the sole shareholder and owner of MBR & Associates, Inc.—the evidence supports the trial court's findings of fact and the correctness of its conclusions of law that Ramon and MBR & Associates, Inc. are

14

alter egos of one another.  *See* 112 S.W.3d at 169 (holding evidence legally sufficient to support trial court's finding that Schlueter was Entertainment Properties's [EP's] alter ego because evidence showed that Schlueter owned all of the stock of EP, was one of its two officers, and referred to himself and EP interchangeably during testimony).  We hold that the trial court therefore did not err by finding Ramon vicariously liable for the acts of MBR & Associates, Inc.

In the alternative, as Lile argued in his brief, the judgment in this case would not change even if the trial court had erred by making its trade name and alter ego findings because the trial court found Ramon individually liable for fraud and DTPA violations.

The DTPA creates a cause of action when a consumer suffers from "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."  Tex. Bus. & Com. Code Ann. § 17.46(a) (West 2011).  Such "acts or practices" include "representing that goods or services have . . . characteristics . . . which they do not have."  *Id.* § 17.46(b)(5); *see Commonwealth Lloyds Ins. Co. v. Downs,* 853 S.W.2d 104, 116 (Tex. App.—Fort Worth 1993, writ denied).  Moreover, "there can be individual liability on the part of a corporate agent for misrepresentations made by him."  *Weitzel*, 691 S.W.2d at 601.

Here, Frank Creed, who worked for MBR-GFR, testified that Ramon trained him and instructed him to represent to potential customers that MBR-GFR had master plumbers and engineers that would oversee the job and that MBR-GFR had liability insurance.  Ramon testified that he had not told anyone to make

15

such representations; he agreed that any such representations were not true. The record, however, contains evidence of statements made by Ramon—that is, that he instructed Creed to represent to potential customers that MBR-GFR had master plumbers and engineers that would oversee the job and that MBR-GFR had liability insurance—upon which the trial court could have relied in concluding that Ramon had made oral misrepresentations. Such evidence supports the trial court's findings of fact that Ramon is personally liable for the misrepresentations that he made.

We therefore alternatively hold that even if the trial court's trade name and alter ego fact findings are supported by insufficient evidence, the evidence supports the trial court's findings that Ramon was individually liable for the misrepresentations that he made in violation of the DTPA. *See id.* (upholding individual liability on part of two corporate officers because record contained evidence of statements of both men that supported trial court's findings that each had made oral misrepresentations that were actionable under DTPA). Thus, the judgment against Ramon individually is supportable based not only on the trial court's trade name and alter ego findings but also, alternatively, based on the trial court's findings supporting DTPA violations by Ramon himself.

We overrule Appellants' fifth issue.

## VI. EVIDENCE ESTABLISHED THAT MISREPRESENTATIONS WERE PRODUCING CAUSE OF LILE'S DAMAGES

In their sixth issue, Appellants argue that Lile failed to establish the proximate cause element of his fraud and DTPA claims. Appellants do not provide a single citation to the record in support of their arguments on this issue. We begin with Lile's DTPA cause of action.

To prevail on a DTPA claim, a plaintiff must prove that the defendant's misrepresentation was the producing cause of the plaintiff's injuries. Tex. Bus. & Com. Code Ann. § 17.50(a) (West 2011); *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex. 2004); *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 616 (Tex. App.—Fort Worth 2006, pet. denied). Producing cause requires that the defendant's acts be both a cause-in-fact and a "substantial factor in bringing about injury which would not otherwise have occurred." *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 223 (Tex. 2010) (quoting *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995)). Unlike proximate cause, producing cause does not require proof of foreseeability. *See Transcon. Ins. Co.*, 330 S.W.3d at 223; *S & I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 856 (Tex. App.—Dallas 2011, no pet.). The plaintiff must also prove that it relied on the defendants' misrepresentation to his detriment. Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(B).

As set forth above, Lile was not required to prove proximate cause, only producing cause, with respect to his DTPA claim. Appellants, in their initial brief,

17

failed to challenge the producing cause element of Lile's DTPA cause of action, raising producing cause only in their reply brief. Because the trial court awarded the same damages under Lile's DTPA and fraud causes of action,[8] if we determine that Lile established the producing cause element of his DTPA claim, we need not address Appellants' proximate cause challenge to Lile's fraud claim.

During the bench trial, Lile testified that Creed told him that MBR-GFR carried liability insurance and had a master plumber and an engineer that would be overseeing the work on Lile's home. Lile glanced at the sales packet that Creed showed him, including what appeared to be a certificate of liability insurance, and testified that Creed's representation that MBR-GFR carried liability insurance was important to him. It was also important to Lile that a master plumber and an engineer would be overseeing the work.[9] Lile relied on Creed's representations and said he would not have allowed workers from MBR-GFR to "step foot on" his property if he had known that MBR-GFR did not have insurance to cover damage to his property. Prior to this incident, Lile did not have knowledge of how the foundation industry operated, had never watched a foundation be repaired, and had no knowledge of the pitfalls in lifting a

---

[8]The judgment awards Lile $150,000 from MBR & Associates, Inc. and $150,000 from Ramon. The findings of fact state that this amount is assessed as exemplary damages based on the gross negligence, *fraud, and knowing and intentional conduct under the DTPA*.

[9]Ramon testified that a licensed plumber and an engineer were not on site when the work on Lile's home started.

foundation. Lile trusted the representations made by Creed about liability insurance and supervision of the work by a master plumber and engineer; in addition, Creed represented that he was going to do a good job and was going to "fix [Lile's foundation] where [Lile] couldn't tell it had ever been repaired."

This evidence factually supports the trial court's conclusion that but for Appellants' misrepresentations, Lile would not have incurred the mudjacking damages in connection with his property. *See Main Place Custom Homes, Inc.*, 192 S.W.3d at 619–20 (holding that homeowners' DTPA claims were based on the causal connection between construction company's owner's misrepresentations and their damages); *see also Choi*, 331 S.W.3d at 856 (holding that there was some evidence of DTPA causation because there was testimony that broker's representations about a vacant gas station remaining vacant were a substantial factor in appellant's purchasing the businesses and that appellant would not have purchased the businesses if the broker had told him that Quiktrip was moving into vacant gas station). We therefore hold that the record contains legally and factually sufficient evidence of the producing cause element of Lile's DTPA claim. *See Carpenter v. Holmes Builders, Inc.*, No. 11-02-00132-CV, 2004 WL 306130, at *7 (Tex. App.—Eastland Feb. 19, 2004, pet. denied) (order and mem. op.) (holding that evidence was legally and factually sufficient to support determination that appellee's DTPA violations were a producing cause of appellants' damages because appellee deficiently selected slab-on-grade foundation for appellants' home despite soil report stating that

19

slab-on-grade floor system should not be used due to excessive shrink/swell movement potential of high plasticity clays found at site). We overrule Appellants' sixth issue.

## VII. MENTAL ANGUISH DAMAGES ARE RECOVERABLE

In their third issue, Appellants argue that Lile cannot recover mental anguish damages in a suit based solely on damage to real property. Appellants rely on *City of Tyler v. Likes*, 962 S.W.2d 489 (Tex. 1997), in arguing that the supreme court has held as a matter of law that mental anguish damages are not recoverable for a claim involving damages to real property.

Appellants fail to acknowledge that the supreme court in *Likes* specifically noted that "mental anguish based solely on *negligent* property damage is not compensable as a matter of law" and that "[b]ecause the injury to Likes's property was not intentional or malicious, or even grossly negligent, we need not decide whether mental anguish arising out of property damage may be legally compensable when a heightened degree of misconduct is found." *Id.* at 497 (emphasis added). *Likes* specifically states that mental anguish damages are recoverable for some common law torts that generally involve intentional or malicious conduct such as libel, battery, and by analogy, for knowing violations of certain statutes such as the DTPA. *Id.* at 495; *see also* Tex. Bus. & Com. Code Ann. § 17.50(b)(1) (permitting award of mental anguish damages on a DTPA claim if the trier of fact finds that the conduct of the defendant was committed "knowingly"); *Luna v. N. Star Dodge Sales, Inc.*, 667 S.W.2d 115, 117 (Tex.

20

1984) (holding that a DTPA plaintiff may recover mental anguish damages when there is proof of a willful tort, willful and wanton disregard, or gross negligence). Where a claim of mental anguish is based solely upon property damage resulting from gross negligence, recovery is contingent upon evidence of some ill-will, animus, or design to harm the plaintiff personally; such rationale is more consistent with the general principle that emotional distress is not usually recoverable as an element of property damages unless an improper motive is involved. *Accord Seminole Pipeline Co., Mapco, Inc. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 757 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Thus, Lile, as a DTPA plaintiff, may recover mental anguish damages if he established that Appellants knowingly engaged in conduct that violated the DTPA.

Here, with regard to whether Appellants knowingly engaged in conduct that violated the DTPA that would entitle Lile to recover mental anguish damages, the trial court made numerous findings of fact, some of which Appellants failed to challenge, related to Appellants' knowing conduct. In findings of fact 139, 140, and 151, among others, the trial court found that the conduct of Appellants was knowing and intentional and rose to the level of gross negligence and malice. Appellants, however, challenge only seven of the trial court's findings of facts: 71, 129, 134, 138, 152, 153, and 161; they do not challenge findings of fact 139, 140, or 151 in connection with this issue. Our review of the record reveals that these unchallenged findings of fact are supported by ample evidence in the

record. Because the record supports the unchallenged findings of fact and because such unchallenged findings of fact are binding on us, we hold that Lile established that Appellants knowingly engaged in conduct that violated the DTPA, and thus Lile was entitled to recover mental anguish damages in connection with his DTPA claim for Appellants' knowing conduct. *See Luna*, 667 S.W.2d at 117 (holding that jury's finding—that the unconscionable actions of a car dealership were committed "knowingly"—was sufficient to support recovery of mental anguish damages in suit involving DTPA claims); *Milton M. Cooke Co.*, 290 S.W.3d at 303 (citing *McGalliard*, 722 S.W.2d at 696). We overrule Appellants' third issue.

## VIII. Sufficient Evidence Exists to Support Mental Anguish Damages

In their fourth issue, Appellants argue that Lile did not present sufficient evidence of past or future mental anguish damages.

### A. Legal Sufficiency Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In

determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

### B. Factual Sufficiency Standard of Review

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

### C. Law on Mental Anguish Damages

The supreme court has admonished appellate courts to closely scrutinize awards for mental anguish damages. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997). An award of mental anguish damages "will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the

23

nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). If there is no direct evidence, we apply "traditional 'no evidence' standards to determine whether the record reveals any evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' to support any award of damages." *Id.*; *see also Latham v. Castillo*, 972 S.W.2d 66, 70 (Tex. 1998) (holding that plaintiff's testimony—that defendant's DTPA violations made him "sick, nervous, [and] mad," that his "heart was broken," and that he "felt physically ill" and vomited—constituted some evidence that defendant's conduct caused plaintiff a "high degree of mental pain and distress" that a jury could consider). It is not necessary, however, for a party to have suffered any physical injury to recover damages for mental anguish. *Star Houston v. Shevack*, 886 S.W.2d 414, 418 (Tex. App.—Houston [1st Dist.] 1994), *writ denied*, 907 S.W.2d 452 (Tex. 1995). Texas courts have held that evidence of a claimant's physical and emotional state, coupled with his inability to eat and sleep, constitutes legally and factually sufficient evidence to support the award of mental anguish damages. *See CA Partners v. Spears*, 274 S.W.3d 51, 76–77 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing four cases from throughout Texas).

Further, in certain categories of cases, the inherent problems of foreseeability and genuineness associated with mental anguish damages are largely mitigated. *See Likes*, 962 S.W.2d at 495. These include some common

24

law torts that generally involve intentional or malicious conduct such as libel, and by analogy, knowing DTPA violations. *Id.*

Moreover, translating mental anguish damages into dollars is necessarily an arbitrary process. *Lone Star Ford v. Hill*, 879 S.W.2d 116, 121 (Tex. App.—Houston [14th Dist.] 1994, no writ). Damages for future mental anguish are recoverable "if there is a reasonable probability that they will be suffered in the future." *Lubbock Cnty. v. Strube*, 953 S.W.2d 847, 857 (Tex. App.—Austin 1997, pet. denied). In the absence of any objective guidelines, we should defer to the factfinder's discretion in determining mental anguish damages. *Lone Star Ford*, 879 S.W.2d at 121.

### D. Sufficient Evidence to Support Mental Anguish Damages

Appellants challenge the following findings of fact in connection with their fourth issue:

Finding of fact 71:

> On the evening of April 17, 2003, after mudjacking concrete entered the sewer system, Rosales and crew suddenly loaded their tools and equipment and left Lile with a house with water and mudjacking concrete all over the walls and floors. Lile was left to try to get the water mixed with mudjacking concrete off the floor by himself. He was stunned and shocked by what he had been told and what he saw. He mopped awhile, then went outside and walked around his house and started to cry. He stayed until early the following morning mopping water mixed with mudjacking concrete and crying. Lile became physically ill, his blood pressure rose, he could not sleep and he worried about what he and his family would do, and how he would tell them what had happened. His house was destroyed. He experienced severe mental anguish as a result of this occurrence. He had just had the mold removed from inside his

25

house and now his house had water mixed with mudjacking concrete on the walls and floors.

Finding of fact 129:

> The conduct of Defendant was a direct, proximate and producing cause of extreme emotional anguish which Lile has suffered since April 17, 2003. He has suffered severe anxiety and worry about how he and his family will continue to survive with a house that is paid for, but uninhabitable; he suffers from physical illness such as upset stomach and headaches; he suffers from high blood pressure; depression; bouts of crying; loss of sleep; loss of appetite; and, hours awake in the early morning hours worrying about what he and his family will do to survive if his house isn't rebuilt, and duration of his extreme emotional anguish has been constant, consistent and ongoing on a daily basis since his ordeal began on the evening of April 17, 2003, and has enveloped his very life.

Appellants also challenge findings of fact 134, 138, 152, 153, and 161, in which the trial court found that $250,000.00 would fairly and reasonably compensate Lile for his emotional anguish in the past and $50,000.00 will in reasonable probability fairly and reasonably compensate Lile for the extreme and severe emotional anguish, which, in reasonable probability, he will sustain in the future.

The record contains legally and factually sufficient evidence to support the above findings of fact. Lile testified that he was told by the foreman not to go in his house because they had destroyed his foundation and his home by filling up all of the sewer lines and drain lines with concrete. Lile wanted to see the extent of the damage and disregarded the foreman's instruction; he entered his home and found it full of standing water. Lile was "absolutely stunned." After the foreman said that they could not repair the foundation and left the house in total

26

disarray, Lile was "just absolutely exasperated. I just -- excuse me. I almost can't -- can't describe how I felt." Later in the testimony, he explained,

> I went ahead and attempted to [use a broom to sweep water out of the house], but I was so exasperated, so absolutely stunned that what I found myself doing was just -- was walking around outside of the house. And -- And I hate to say it, you know, it -- it's upsetting me right now. It upset me. I need to stop.
>
> It upset me a great deal. A great deal. . . .

Lile further explained,

> I was going to try to get some of that -- that water and mud and concrete out of the house. And what I found myself doing was walking around the outside, and as I did a while ago, became quite upset trying to think what I was going to tell my family.
>
> And what -- you know, a man usually tries to control his emotions, and it didn't work. It didn't work a while ago. I was just -- and I don't like to admit it, but I was crying. And for me it's embarrassing, but -- so I was trying to figure out what -- what I was going to tell my family, my wife and my daughter that was still at home.
>
> And trying to determine what -- what in the world I was going to do. And the more I approached those, the more emotional I got about it. And I probably spent 45 minutes at the house just emotionally upset and emotionally drained. Trying to give myself enough time so I could go back to the house and I didn't want Charlotte and Jennifer to be aware of that.
>
> . . . .
>
> You know, I was trying to do stuff [e.g., rolling the garden hoses and putting them away]. I don't know about other people, but when -- when I come to that point, I try to start doing things to -- to -- not too many times in my life have I been that emotional. And -- And I was extremely emotional.

27

Throughout the record, Lile testified that he was stunned and devastated, that it was very upsetting to his family, and that it was very upsetting to not be able to maintain his house and to have to live like hermits. Lile explained that he felt guilty and embarrassed that he could not put a roof over his family.

In addition to the emotional problems listed above, Lile testified that he had experienced physical problems after his house was destroyed, including stomach problems, extremely high blood pressure, severe heart problems, sleeplessness, dizziness, lightheadedness, and depression. Lile explained that he experiences extremely high blood pressure, "especially when [he] begin[s] to get upset as [he] does] because this is in front of [him] every day, every night, 3:00 or 4:00 in the morning." Lile said that he had not encountered problems with his blood pressure, nor had he experienced dizziness, prior to the mudjacking damage to his home. In 2005, the year following the mudjacking, Lile was diagnosed with "extremely serious" health problems. He was told that he had "possibly six months" to live. He lost four teeth in the years following the mudjacking incident because he did not have money for dental work. Lile became upset while he was testifying and said that he had been upset when he saw his house, "just like I am today"; he said he was "in a lot of turmoil, still am to this day."

Lile's testimony constitutes "direct evidence of the nature, duration, and severity of [his] mental anguish" and establishes "a substantial disruption in [his] daily routine." *See Parkway*, 901 S.W.2d at 444. Lile's testimony revealed that he suffered from more than just "worry and anxiety" as argued by Appellants; he

28

experienced physical and emotional suffering, in addition to an inability to sleep. *See CA Partners*, 274 S.W.3d at 76–77. And he was continuing to experience such physical and emotional suffering at the time of the trial, with no end in the foreseeable future. We therefore hold that the evidence is legally sufficient to support the trial court's award of past and future mental anguish damages under the DTPA. *See id.* at 78 (holding evidence legally sufficient to support award of mental anguish damages under DTPA); *Carpenter*, 2004 WL 306130, at *6 (holding jury's award of mental anguish damages was supported by legally sufficient evidence because appellants' testimony—that problems with their dream home's foundation caused anxiety, embarrassment, feelings of helplessness, recurring eye infection from the stress, sleepless nights, and daily bouts of crying—constituted evidence that the ordeal caused a substantial disruption of their daily lives over an extended period of time).

Moreover, after considering and weighing all of the evidence in the record pertinent to the mental anguish findings, we hold that the credible evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the findings should be set aside and a new trial ordered. Appellants did not present evidence contradicting Lile's testimony. Absent such evidence, Lile's testimony is factually sufficient to support the trial court's award of past and future mental anguish damages under the DTPA. *See CA Partners*, 274 S.W.3d at 78 (holding evidence factually sufficient to support award of mental anguish damages under DTPA); *Carpenter*, 2004 WL 306130, at *6

29

(holding jury's award of mental anguish damages was supported by factually sufficient evidence).

Furthermore, in light of Lile's testimony that he suffered mental anguish on a daily basis from the time of the incident through the time of trial and deferring to the trial court's discretion in determining the amount of mental anguish damages, we hold that the amounts awarded are reasonable based on the frequency and duration of his mental suffering. *See Carpenter*, 2004 WL 306130, at *6. Additionally, the mental anguish damages are not unreasonable when compared to the other damages awarded by the trial court. *See id.* We therefore overrule Appellants' fourth issue.

## IX. STATUTE OF LIMITATIONS DEFENSE NOT A BAR TO CLAIMS AGAINST RAMON

In the second issue, Ramon argues that the trial court erred by denying his limitations defense. Specifically, Ramon argues that Lile's Second Amended Petition filed January 30, 2007—which asserted claims against Ramon in his individual capacity for the first time and was filed more than two years after Lile's property was damaged on April 17, 2003—did not relate back to Lile's timely filed suit against MBR & Associates, Inc. Ramon's argument fails in light of the trial court's finding of alter ego, which was not challenged with regard to this issue.[10] Because we have upheld the trial court's finding that Ramon is the alter ego of MBR & Associates, Inc., the statute of limitations was tolled as to Ramon when

---

[10]Appellants' supplemental brief does not challenge any finding of fact relating to this issue.

30

Lile sued MBR & Associates, Inc.  *See Matthews Constr. Co. v. Rosen*, 796 S.W.2d 692, 693 (Tex. 1990) (citing *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 575 (Tex. 1975), for the proposition that suit against a corporation tolls limitations as to the alter ego of the corporation and quoting from *Gentry*, "The purpose of the court in cases of this nature is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice . . . .").  We hold that the trial court therefore did not err by denying Ramon's limitations defense, and we overrule Appellants' second issue.

## X. CALCULATION OF PREJUDGMENT INTEREST

In the eighth issue, Ramon argues that the trial court incorrectly calculated the prejudgment interest as to him.  Specifically, Ramon argues that because Lile first filed his claims against Ramon on January 30, 2007, it is improper to award prejudgment interest dating back to the original filing against MBR & Associates, Inc. on June 2, 2004.[11]

Both parties agree that Texas Finance Code section 304.104 governs the accrual of prejudgment interest.  Texas Finance Code section 304.104 states that "prejudgment interest accrues on the amount of a judgment during the period beginning on the *earlier* of the 180th day after the date the defendant receives

---

[11]In their postsubmission brief, Appellants challenge conclusion of law 31 in connection with this issue.  Conclusion of law 31 states only that "Lile is entitled to prejudgment interest on his damages at the rate of five percent (5%) per annum, against MBR & Associates, Inc. and Ramon, jointly and severally . . . ."  It does not, however, set forth the date on which the prejudgment interest accrues.

31

written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." Tex. Fin. Code Ann. § 304.104 (West 2006) (emphasis added). The only dispute is over which date should be used for the prejudgment interest on the judgment against Ramon.

The statute, however, does not provide for the delayed accrual date that Ramon seeks. The statute specifically states that prejudgment interest accrues on the *earlier* of (1) 180 days after the defendant receives notice, which Ramon claims would be a 180 days after he was added to the suit on January 30, 2007, or (2) "the day suit was filed," which was June 2, 2004. The statute does not state "the day suit was filed against *the particular defendant*." Thus, under the statute, the June 2, 2004 date, which is clearly the earlier of the two, is the accrual date for the prejudgment interest on the judgment against Ramon. *See id.*; *see also Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 846–47 (Tex. 2009) (declining to read language into the statutes and citing *Seay v. Hall*, 677 S.W.2d 19, 25 (Tex. 1984) ("While this court may properly write in areas traditionally reserved to the judicial branch of government, it would be a usurpation of our powers to add language to a law where the legislature has refrained.")).

Not only is this result proper under the previous statutory construction, the same result is reached under the alter ego theory. Because we held above that MBR & Associates, Inc. is Ramon's alter ego, Lile's suit against MBR & Associates, Inc. was effectively the same as filing suit against Ramon. *See*

*Matthews Constr. Co.*, 796 S.W.2d at 692–94; *Schlueter*, 112 S.W.3d at 169. Thus, under the alter ego theory, the prejudgment interest accrues on the judgment against Ramon beginning on June 2, 2004, when suit was filed against MBR & Associates, Inc., Ramon's alter ego. *See, e.g., Hughes v. Thrash*, 832 S.W.2d 779, 787–88 (Tex. App.—Houston [1st Dist.] 1992, no writ) (holding that date prejudgment interest accrued against individual was same as the date suit was filed against entity, even though individual was added to suit by an amended petition seven months after the entity was sued, because entity was an assumed name of individual).

Because under both statutory construction and the alter ego theory the prejudgment interest on the judgment against Ramon begins accruing on June 2, 2004, we hold that the trial court did not err in its calculation of prejudgment interest on the judgment against Ramon. We overrule Appellants' eighth issue.

## XI. NO ERROR IN FAILING TO ASSIGN LIABILITY TO OTHERS

In their seventh issue, Appellants argue that the trial court's ruling that the "designated responsible third-parties" bore no responsibility is against the great weight and preponderance of the evidence. Specifically, Appellants argue that the trial court committed reversible error when it refused to find that Appellants were not entitled to an offset in the amount of the settlement between Lile and Baker Brothers Plumbing.

The record demonstrates that Lile began having problems with his home in 2002. Prior to the foundation issue at hand, Lile discovered black mold in his

33

home, and the problem was traced to leaks in the water supply lines. Baker Brothers Rotovisions, Inc. repaired leaks in the toilets and underneath the kitchen sink, completing the work in 2002. After the repairs were completed, there were no other leaks in the water supply lines.

In May or June 2002, Baker Brothers discovered that the sewer lines to Lile's home were leaking. Baker Brothers caused the toilet to overflow with raw sewage. Baker Brothers caused damage to both toilet areas, underneath the counters, the tubs, the hall, the foyer, the laundry room, part of the master bedroom, a couple of closet areas, part of the middle bedroom, the dining room, and the roof. The sewage also damaged the Sheetrock. Baker Brothers did nothing to help Lile clean up the mess that they had caused. Lile later sued Baker Brothers for the damage caused by the sewage and ultimately settled with them for $8,000.

In June or July 2002, it was discovered that the foundation had moved as a result of the leaking sewer lines and that the sewer lines needed to be replaced. So in August 2002, Steven Thomas Lux, a master plumber who was referred by Power Jack Foundation Company, started the sewer line replacement; he did not, however, jackhammer any holes in Lile's foundation. When Lux completed the replacement of the sewer line, Lile observed Lux conduct a hydrostatic test on the line, which showed that there were no leaks or cracks in the line.

In March 2003, ASAP Containment, a mold remediation company, removed carpeting, Sheetrock, some kitchen cabinets, and some of the ceiling in

several rooms in order to rid the home of mold. ASAP also repaired the roof. At that point, all of the water leaks had been repaired, the sewer system had been replaced, and the mold remediation had been completed.

Lile testified that after ASAP Containment had completed structural remediation and prior to MBR's starting work on Lile's home, there were no holes punched through the slab of the interior of the foundation. There were also no tunnels under the house; Lux and his crew had filled them when they replaced the sewer lines. Lile further testified that he had never had any mudjacking work done on his home prior to the day that MBR started its work. After MBR put mudjacking cement in Lile's sewer system, no one else came and did any mudjacking work on Lile's home.

The trial court found that Baker Brothers and the other providers listed above did not commit any act, omission, or other conduct in performing services for Lile that caused or contributed to causing any damages or harm that Lile sustained as a result of Appellants' conduct.

Based on the record, there is no evidence that any other person or entity was responsible for the mudjacking damage caused by Appellants. As set forth above, no other person or entity performed mudjacking work on Lile's home, and thus no other person or entity contributed to cause the damages Lile sustained as a result of the mudjacking performed by Appellants. Moreover, Appellants' attempt to receive an offset in the amount of the settlement between Lile and Baker Brothers fails not only because there is no evidence to support it but also

because Baker Brothers was no longer a party to the suit at the time of the trial; the trial court had entered an order striking Appellants' cross-claims against Baker Brothers, and Appellants failed to challenge the order. And because Appellants never obtained an order on their motion to add Lux and Mendoza as responsible third parties and never challenged the order striking their counterclaims against Lux and Mendoza, the only parties in the case at the time of the trial were MBR & Associates, Inc.; Ramon; and Lile. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a) (West 2008) (stating that "trier of fact . . . shall determine the percentage of responsibility . . . for . . . each responsible third party who has been designated under Section 33.004"). We therefore hold that the evidence is legally and factually sufficient to support the trial court's findings of fact 210, 211, 212, 213, and 214, which find that other service providers are not responsible as third parties for the damages resulting from the mudjacking performed by Appellants. We overrule Appellants' seventh issue.

## XII. No Need to Remand to Reconsider Exemplary Damages

Because we have held that there is sufficient evidence to support the trial court's findings of fact that were challenged above by Appellants and because we have not modified the judgment to delete any of the damages awarded by the trial court, we need not reach Appellants' ninth issue in which they argue that remand is necessary to reconsider exemplary damages in the event we modify the judgment. *See* Tex. R. App. P. 47.1 (stating that appellate court need only address every issue necessary for final disposition of the appeal).

36

## XIII. CONCLUSION

Having overruled each of Appellants' issues necessary for final disposition of the appeal, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED:  October 4, 2012